UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- x
                                           :

KATHY DREW KING,                 :

                 Petitioner,   :    Case No. 1:19-cv-03496 (NGG) (VMS)

            v.            :

CONSTRUCTION & GENERAL BUILDING   :
LABORERS' LOCAL 79,         :

                 Respondent.  :

---------------------------------------------------------- x

## RESPONDENT'S MEMORANDUM IN OPPOSITION
## TO THE REQUEST FOR A TEMPORARY RESTRAINING ORDER

Joseph J. Vitale
Cohen, Weiss and Simon LLP
900 Third Avenue, Suite 2100
New York, New York 10022
Telephone:  (212) 356-0238
Facsimile:  (646) 473-8238
jvitale@cwsny.com

Tamir W. Rosenblum
Mason Tenders District Council
  of Greater New York
520 Eighth Avenue, Suite 650
New York, New York 10018
(212) 452-9407

Counsel for Construction and General
Building Laborers Local 79

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT........................................................................................................... 2

NO TEMPORARY RESTRAINING ORDER SHOULD ISSUE BECAUSE THE REGIONAL DIRECTOR CANNOT SHOW THAT THERE IS REASONABLE CAUSE TO BELIEVE THE NATIONAL LABOR RELATIONS ACT HAS BEEN VIOLATED AND THAT THE REQUESTED RELIEF IS "JUST AND PROPER"...................................................................... 2

I.     A TRO IS NOT "JUST AND PROPER" IF THE REGIONAL DIRECTOR
       SEEKS AN "UNPRECEDENTED APPLICATION OF THE ACT".................................. 2

II.    THE REGIONAL DIRECTOR IMPROPERLY BASES HER REQUEST
       FOR A TRO ON A THEORY THAT IS CONTRARY TO CURRENT
       BOARD LAW THAT PERMITS UNIONS TO USE THE INFLATED RAT.................. 6

III.   MINDFUL OF THE FIRST AMENDMENT, THE COURTS HAVE
       ROUTINELY REJECTED ATTEMPTS TO ENJOIN A UNION'S
       USE OF THE RAT AND THE DISTRIBUTION OF LEAFLETS .................................. 9

       A.     The Supreme Court in 1988 Rejected the NLRB's Attempt to Use the
              Secondary Boycott Provisions of the NLRA as a Means to Deny Unions
              and Union Members Their First Amendment Right to Distribute Leaflets ............ 9

       B.     In the Thirty Years Since the Supreme Court's Decision in *DeBartolo,* the Courts
              Have Expanded the Expressive Activity Permitted Against Secondary Employers
              to Include, Among Other Things, the Use of an Inflated Rat ................................. 11

       C.     Since Its Decision in *DeBartolo,* the Supreme Court's
              Protection of First Amendment Activity Has Only Increased .............................. 13

       D.     To the Extent the Regional Director Seeks to Enjoin
              the Distribution of Leaflets, That Request Must Be Denied.................................. 17

IV.    A TRO AGAINST THE UNION HOLDING A RALLY
       ON A PUBLIC SIDEWALK IS EQUALLY IMPROPER ............................................. 18

V.     EVEN UNDER GENERAL EQUITABLE
       PRINCIPLES,THE TRO IS UNWARRANTED ............................................................. 23

       A.     The Requested TRO Is Vague and Overbroad ...................................................... 23

Page

B.      The Regional Director Has Unduly Delayed in Her Request and
        Otherwise Fails to Show that Equity Calls for an Injunction to Issue .................. 24

CONCLUSION ............................................................................................................................. 25

## TABLE OF AUTHORITIES

<u>Case</u>                                                                                                                <u>Page</u>

*Ahmad v. Long Island Univ.*, 18 F.Supp.2d 245 (E.D.N.Y. 1998) ................................................24

*Benson v. United Bhd. of Carpenters & Joiners, Locals 184 & 1498*,
    337 F.Supp.2d 1275 (D. Utah 2004)............................................................................................8

*Blyer v. New York Coat, Suit, Dress, Rainwear & Allied Workers' Union*,
    522 F.Supp. 723 (S.D.N.Y. 1981) ..........................................................................................3, 4

*Capital Awning Co. v. Local 137 Sheet Metal Workers Int'l Ass'n*,
    698 F.Supp.2d 308 (E.D.N.Y. 2010) .........................................................................................11

*Carpenters Local 1506 (Eliason and Knuth of Arizona)*, 355 N.L.R.B. 797 (2010).................7, 8

*Carpenters Local 1827 (Eliason and Knuth of Denver)*, 357 N.L.R.B. 415 (2011) ......................7

*Carrier Air Conditioning Co. v. NLRB*, 547 F.2d 1178 (2nd Cir. 1976)......................................11

*Danielson v. Joint Board of Coat, Suit & Allied Garment Workers*,
    494 F. 2d 1230 (2d Cir. 1974).........................................................................................4, 5, 24

*DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*,
    485 U.S. 568 (1988)............................................................................................................. *passim*

*IBEW, Local 98 (Shree Sai Siddhi Spruce)*, 2019 WL 2296952 (NLRB Div. of
    Judges, May 28, 2019).........................................................................................................8, 20

*Kohn v. Southwest Reg'l Council of Carpenters*, 289 F.Supp.2d 1155 (C.D. Cal.
    2003) ............................................................................................................................................9

*Laborers' Eastern Region Organizing Fund (The Ranches at Mt. Sinai)*,
    346 N.L.R.B. 1251 (2006) ..........................................................................................................8

*Linn v. United Plant Guard Workers*, 383 U.S. 53 (1966) ...........................................................16

*LIUNA, Local 872*, 363 N.L.R.B. No. 168 (April 29, 2016) ........................................................11

*Local 330 v. Town of Chute*, 834 F.3d 745 (7th Cir. 2016) ..........................................................11

*McCullen v. Coakley*, 573 U.S. 464 (2014) ..................................................................................18

*McLeod v. National Maritime Union of America*, 457 F.2d 490 (2d Cir. 1970) .........................4, 5

*Metropolitan Opera Ass'n v. Local 100*, 239 F.3d 172 (2d Cir 2001) ...............................15, 16, 24

<u>Case</u>                                                                                                    <u>Page</u>

*Microtech Contracting v. Mason Tenders District Council*,
    55 F.Supp.3d 381 (E.D.N.Y. 2014) ...................................................................12, 13

*NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) ............................................16

*Organization for a Better Austin v. Keefe*, 402 U.S. 415 (1971) ...................................16

*Overstreet v. United Brotherhood of Carpenters and Joiners*,
    409 F.3d 1199 (9th Cir. 2005) ...................................................................................8

*Pathmark Stores, Inc.*, 342 N.L.R.B. 378 (2004) ..........................................................8

*Sheet Metal Workers Int'l Ass'n (Brandon Medical Center)*,
    356 N.L.R.B. 1290 (2011) ..................................................................................7, 8

*Sheet Metal Workers Int'l Ass'n, Local 15 (Brandon Regional Medical Center)*,
    346 N.L.R.B 199 (2006), *enforcement denied*, 491 F.3d 429 (D.C. Cir. 2007) .....................12

*Sheet Metal Workers' Int'l Ass'n, Local 15 v. NLRB*,
    491 F.3d 429 (D.C. Cir. 2007) ...............................................................................12

*Silverman v. 40-41 Realty Assocs.*, 668 F.2d 678 (2d Cir. 1982) ........................................ *passim*

*Silverman v. Local 78, Asbestos Workers*, 958 F.Supp. 129 (S.D.N.Y. 1996) ...........................24

*Snyder v. Phelps*, 562 U.S. 443 (2011) ...........................................................13, 14, 17

*State v. DeAngelo*, 185 L.R.R.M. 3057 (Sup. Ct. N.J. 2009) .........................................12

*Tru-Art Sign Co., Inc. v. Local 137 Sheet Metal Workers Int'l Ass'n*,
    573 F.App'x 66 (2d Cir. 2014) ...............................................................................11

*Tucker v. City of Fairfield*, 398 F.3d 457 (6th Cir. 2005).............................................11

*Venetian Casino Resort*, 345 N.L.R.B. 1061 (2005) .....................................................19

*Venetian Casino Resort v. Local Joint Exec. Bd.*, 257 F.3d 937 (9th Cir. 2001) .........................19

*Virginia v. Black*, 538 U.S. 343 (2003).........................................................11, 13, 14, 17

*West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) .........................................11

<u>Statutes</u>

U.S.C. § 104(e) ...........................................................................................24

National Labor Relations Act ................................................................... *passim*

Statutes                                                                                                    Page

29 U.S.C. § 104 ................................................................................................................. 24

Other Authorities

First Amendment ........................................................................................................... *passim*

Lewis Carroll, THROUGH THE LOOKING-GLASS, AND WHAT ALICE FOUND THERE
    124 (Michael Everson ed., Evertype 2009) (1871) ..................................................... 6

## PRELIMINARY STATEMENT

Respondent Construction and General Building Laborers Local 79 ("Local 79" or the "Union") submits this memorandum of law in opposition to the request of the Regional Director for a temporary restraining order ("TRO") that would prevent Local 79 and its members from exercising their rights under the National Labor Relations Act ("NLRA") and under the First Amendment.[1]

According to the Regional Director, she has a reasonable basis for believing that the Union has violated the secondary boycott provisions of the NLRA by unlawfully "enmeshing" Mannix Family Market, which operates three Shop Rite supermarket stores in Staten Island, in a dispute that Local 79 has with Kimco Realty Corp. ("Kimco") and GTL Construction LLC ("GTL"), which are paying substandard wages to construction workers who are building a new shopping center where Mannix Family Market will open a new Shop Rite.

Contrary to the Regional Director's suggestion, there is nothing unlawful about "enmeshing" secondary employers in a dispute a union may have with a primary. As the Supreme Court has held, a union and its members have a First Amendment right to publicly criticize a secondary, even if the union's object is to persuade a secondary from doing business with another business. The Board therefore cannot interpret the NLRA's prohibition against "threatening" or "coercing" secondaries as somehow stripping the Union of that First Amendment right. Mindful of the Supreme Court's admonition, the Board has clearly held that a union can still engage in expressive conduct such as rallies, stationary banners, inflated rats and the distribution of leaflets all aimed at shaming a

---

[1] At approximately 11:30 a.m. on June 13, 2019, Local 79 submitted to chambers a brief in opposition to the papers served by the Regional Director at approximately 11:00 a.m. that same day. Pursuant to the Order to Show Cause dated June 14, the Union submits this brief. For the Court's convenience, Local 79 will in this brief restate (and expand upon) the arguments made in its initial submission, thereby rendering reference to the initial brief unnecessary.

secondary employer to stop doing business with a primary. Such activities do not fall within the lawful prohibition against picketing.

With her belated request for a TRO against "the use of inflatable rats or cockroaches," or anything that could be viewed as "coercive" of Mannix, the Regional Director seeks a TRO that is unwarranted under the First Amendment, under the NLRA, and under traditional equitable considerations. Her request should be denied.

## **ARGUMENT**

NO TEMPORARY RESTRAINING ORDER SHOULD ISSUE BECAUSE THE REGIONAL DIRECTOR CANNOT SHOW THAT THERE IS REASONABLE CAUSE TO BELIEVE THE NATIONAL LABOR RELATIONS ACT HAS BEEN VIOLATED AND THAT THE REQUESTED RELIEF IS "JUST AND PROPER"

In *Silverman v. 40-41 Realty Associates*, the Second Circuit made it clear that when presented with a request for injunctive relief by a Regional Director, the Court must determine two things: (1) whether there is reasonable cause to believe the National Labor Relations Act ("NLRA") has been violated; and (2) that the requested relief is "just and proper."[2]

The Second Circuit further noted that a district court's ability to issue injunctions under the NLRA "in no way change[s] the extraordinary nature of the injunctive remedy."[3]

I.   A TRO IS NOT "JUST AND PROPER" IF THE REGIONAL DIRECTOR SEEKS AN "UNPRECEDENTED APPLICATION OF THE ACT"

In *Realty Associates*, the Second Circuit held that injunctive relief is not "just and proper" where the legal theory advanced by the Regional Director involves an "unprecedented

---

[2] *Silverman v. 40-41 Realty Assocs.*, 668 F.2d 678, 680 (2d Cir. 1982).

[3] *Id.*

application of the Act," or where the issue in a given case is "a difficult one that had not been considered by any court."[4]

The Court recognized that the NLRA "envisaged a system in which the Board would, *in the first instance*, consider and decide the issues arising under the Act and pending before it, subject to *later review* by the Courts of Appeals."[5]  The Court therefore vacated the lower court's temporary injunction permitting interior picketing within an office building (which was a novel application of law governing picketing on a sidewalk) while the NLRB considered the lawfulness of such conduct.  The Court reasoned that to consider an interior hallway the functional equivalent of a sidewalk for picketing purposes "places an entirely novel and questionable construction upon the Act."[6]

In vacating the temporary injunction, the *Realty Associates* Court explained that the Regional Director's request for an injunction was an improper attempt to "invert[] the traditional relationship between administrative agency and court: the court is asked to make the initial ruling as to the propriety of a novel and unprecedented application of the statute, and thereafter the Board will apply its expertise to the issues presented."[7]

In *Blyer v. New York Coat, Suit, Dress, Rainwear and Allied Workers' Union*, the district court similarly denied an injunction against picketing because the Regional Director was

---

[4] *Id.*

[5] *Id.* (emphasis added).

[6] *Id.* at 681.

[7] *Id.*

trying "to develop new law," "proceeding on the basis of a novel theory, never before upheld by the courts."[8]

In her Memorandum in Support of her request for a TRO, the Regional Director does not attempt to distinguish *Realty Associates*, she ignores it.[9]  Instead, she cites a host of earlier Second Circuit decisions to pretend that this Court should overlook the "novelty" of her request.  Quoting from two decisions from the Second Circuit prior to *Realty Associates*, the Regional Director asserts "Even on an issue of law, the district court should be hospitable to the views of the General Counsel, however novel"[10] because "the Board, rather than the district courts, remain the 'primary fact finder' and 'primary interpreter of the statutory scheme,' subject to judicial review."[11]

These two quoted cases undermine, rather than support, the instant application.

*Joint Board of Coat, Suit and Allied Garment Workers* reversed the lower court's issuance of an injunction, so its holding is of no comfort to the Regional Director.  Nor can the Regional Director take refuge in the language she quotes as she ends the quote a sentence too soon.  The quoted remark about hospitality to novel views is immediately followed with "when,

---

[8] *Blyer v. New York Coat, Suit, Dress, Rainwear & Allied Workers' Union*, 522 F.Supp. 723, 727, 729 (S.D.N.Y. 1981).

[9] *See* Petitioner's Memorandum of Law in Support of Petition for Temporary Restraining Order, dated June 13, 2019 (Docket No. 6) ("NLRB Br.").

[10] NLRB Br. at 6 (quoting *Danielson v. Joint Board of Coat, Suit & Allied Garment Workers*, 494 F. 2d 1230, 1241 (2d Cir. 1974).

[11] NLRB Br. at 6 (quoting *McLeod v. National Maritime Union of America*, 457 F.2d 490, 494 (2d Cir. 1970).

after full study, the district court is convinced that the General Counsel's legal position is wrong, as [the lower court] properly was here, *it should not issue an injunction.*"[12]

      *National Maritime Union of America* is equally unhelpful. Immediately prior to the language quoted by the Regional Director, the Second Circuit explained that to decide whether a Regional Director has "reasonable cause" to believe the NLRA is being violated, the court must "examin[e] the facts of the case with reference to the law *as it had been developed by the Board and its reviewing courts.*"[13] The Regional Director urges this Court to recognize the primacy of the Board's role in interpreting the NLRA, but at the same time she improperly seeks to elevate herself over the Board. The Board has already interpreted the secondary boycott provisions of the NLRA as allowing unions to engage in expressive conduct such as the use of rallies, banners and inflated rats directed at secondary employers.[14] The "reviewing courts" have already held that the Board's interpretations must be consistent with the First Amendment rights of unions, and the courts have struck down interpretations that run afoul of such rights.

      Here, the Regional Director is not merely advancing a "novel" theory or some never-before-considered interpretation of the secondary boycott provisions of the NLRA. As Local 79 will demonstrate in the next section, the Regional Director is disregarding the primacy of the Board and ignoring the role of the judiciary in protecting the First Amendment rights of unions. She seeks a TRO that is at odds with Board precedent directly on point and in conflict with the First Amendment. Without so much as referencing, let alone engaging with, the long line of judicial and NLRB decisions that interpret and give meaning to the salient words of the

---

[12] *Joint Bd. of Coat, Suit & Allied Garment Workers*, 494 F.2d at 1241 (emphasis added).

[13] *National Maritime Union of Am.*, 457 F.2d at 494 (emphasis added).

[14] *See infra* Sections II & III.

secondary boycott provision at issue—words such as "coerce" and "threaten"—the Regional Director has provided the Court a signed declaration attesting to her judgement that Local 79 is "threatening, coercing, and restraining persons" in violation of Section 8(b)(4).[15]

The NLRA, however, does not give the Regional Director any privilege as an interpreter of statutory terms. She does not get to conclude that balloons are "coercive" or that an assembly of mainly stationary people on a public sidewalk is "threatening." Lewis Carroll's *Through the Looking Glass* has a poignant exchange about that kind of claimed authority over the meanings of words.[16]

The Regional Director is not the "the master" of statutory terms, let alone without having referenced the relevant cases. Rather, the courts are the "masters" of what legal terms mean within the confines of the First Amendment, and so the Regional Director's attempt to redefine the meaning of already well-defined words is, by itself, reason enough to deny her Petition.

## II. THE REGIONAL DIRECTOR IMPROPERLY BASES HER REQUEST FOR A TRO ON A THEORY THAT IS CONTRARY TO CURRENT BOARD LAW THAT PERMITS UNIONS TO USE THE INFLATED RAT

Since 2010, cognizant of the protection the First Amendment affords unions and their members (the judicial contours of which Local 79 will address in Section III), the NLRB has consistently held that expressive conduct such as a stationary banner, the distribution of

---

[15] Declaration, ¶ 3 (Docket No. 5).

[16] Lewis Carroll, THROUGH THE LOOKING-GLASS, AND WHAT ALICE FOUND THERE 124 (Michael Everson ed., Evertype 2009) (1871) ("'When I use a word,' Humpty Dumpty said, in rather a scornful tone, 'it means just what I choose it to mean—neither more nor less.' 'The question is,' said Alice, 'whether you can make words mean so many different things.' 'The question is,' said Humpty Dumpty, 'which is to be master — that's all'").

leaflets, and the use of an inflated rat to "shame" a secondary employer does not violate Section 8(b)(4).

In *Sheet Metal Workers International Association (Brandon Medical Center)*, for instance, the Board held that the distribution of leaflets and the use of a rat balloon at a secondary employer's facility to protest its use of a nonunion contractor is a constitutionally protected expression within the parameters of the First Amendment, and the rat is protected symbolic speech that did not violate the National Labor Relations Act.[17]

The Board has not required a union to limit itself to only one form of expressive conduct and has rejected the notion that two lawful activities "in combination were more than the sum of their lawful parts."[18]

The General Counsel of the NLRB, Peter Robb, however, has staked out a new position—that expressive conduct constitutes unlawful picketing. He does so fully aware that this interpretation of the NLRA is contrary to established Board law. He wants Regional Directors to pursue this new theory, that will inevitably be rejected by the Administrative Law

---

[17] *Sheet Metal Workers Int'l Ass'n (Brandon Medical Center)*, 356 N.L.R.B. 1290 (2011); *see also Carpenters Local 1506 (Eliason and Knuth of Arizona)*, 355 N.L.R.B. 797 (2010) (permitting the use of a stationary banner).

[18] *Carpenters Local 1827 (Eliason and Knuth of Denver)*, 357 N.L.R.B. 415, 419 (2011) ("The handbilling alone was undisputedly lawful, and the banner displays alone were lawful.... Nothing in the record or the law suggests that these two activities in combination were more than the sum of their lawful parts").

Judge who hears the Complaint against Local 79,[19] so the Board can re-consider its decisions since 2010.[20]

Robb is not the first NLRB General Counsel to challenge a union's right to engage in expressive activity using the symbol of an inflated rat. Arthur Rosenfeld, the NLRB General Counsel from June 2001 to July 2005, argued for the suppression of the rat-symbol in *Laborers' Eastern Region Organizing Fund (The Ranches at Mt. Sinai)*, 346 N.L.R.B. 1251 (2006). There, the NLRB declined to adopt an ALJ's (skewed) reasoning that the inflated rat was a presumptively illegal symbol. And while Rosenfeld three times sought injunctions under Section 10(l) to prevent unions from using large banners (all unsuccessful),[21] he never sought Section 10(l) relief with respect to the inflated rat.

---

[19] After the issuance of a complaint by a Regional Director, a hearing is conducted before an Administrative Law Judge ("ALJ"), who issues a decision and recommends an Order, which can be appealed to the Board. https://www.nlrb.gov/cases-decisions/decisions/administrative-law-judge-decisions. ALJs are required to follow and apply existing Board law. *Pathmark Stores, Inc.*, 342 N.L.R.B. 378 n.1 (2004) ("[I]t remains the [ALJ's] duty to apply established Board precedent which the Supreme Court has not reversed"); *IBEW, Local 98 (Shree Sai Siddhi Spruce)*, 2019 WL 2296952 (NLRB Div. of Judges, May 28, 2019) (rejecting General Counsel's argument that use of the inflatable rat, along with handbilling, constituted picketing or at least coercion, ALJ notes that the argument "run[s] counter" to *Carpenters Local 1506 (Eliason & Knuth of Arizona)*, 355 N.L.R.B. 797 (2010), and *Sheet Metal Workers Local 15 (Brandon Medical Center)*, 356 N.L.R.B. 1290 (2011), and that the ALJ was "of course, bound to apply existing Board law").

[20] *See* Advice Memorandum issued December 20, 2018 in Case No. 13-CC-225655 (directing the Regional Director to issue a complaint that a union violated Section 8(b)(4) by "erecting a large, stationary banner...as well as a large, inflatable cat clutching a construction worker by the neck" and compelling the Regional Director to "urge the Board to reconsider its decisions in *Carpenters Local 1506 (Eliason & Knuth of Arizona)*, which found stationary banners lawful, and in *Sheet Metal Workers Local 15 (Brandon Medical Center)*, which found the large inflatable rats lawful. The Advice Memorandum is available at https://www.nlrb.gov/news-publications/nlrb-memoranda/advice-memos.

[21] *See, e.g., Overstreet v. United Brotherhood of Carpenters and Joiners*, 409 F.3d 1199 (9th Cir. 2005) (affirming denial of injunction against union use of banners in light of *DeBartolo* and First Amendment protections); *Benson v. United Bhd. of Carpenters & Joiners, Locals 184 & 1498*, 337 F.Supp.2d 1275 (D. Utah 2004) (denying injunction against display of banners and

This Court should recognize the temerity of the current request. The Court is being asked not only to upend current Board law but is being petitioned to do so on a subject which the NLRB wrestled with in the early 2000s and which for approximately nine years now has been settled NLRB law.

The instant request is not only historically unprecedented, as explained below, it is unlawful under the First Amendment.

III.   MINDFUL OF THE FIRST AMENDMENT, THE COURTS HAVE
       ROUTINELY REJECTED ATTEMPTS TO ENJOIN A UNION'S
       USE OF THE RAT AND THE DISTRIBUTION OF LEAFLETS

   A.   The Supreme Court in 1988 Rejected the NLRB's Attempt to Use the
        Secondary Boycott Provisions of the NLRA as a Means to Deny Unions
        and Union Members Their First Amendment Right to Distribute Leaflets

More than thirty years ago, the Supreme Court cautioned the Board about using the secondary boycott prohibitions of Section 8(b)(4) to deny unions and their members their First Amendment rights.

In *DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council*, the union distributed handbills at the entrances of a shopping mall urging customers not to shop anywhere in the mall because one tenant was using a non-union construction company to build a store within the mall and that company paid its workers substandard wages.[22] The union urged this boycott until the mall and all of its tenants—even though neither the mall nor the other

---

peaceful distribution of leaflets in light of *DeBartolo* and First Amendment protections); *Kohn v. Southwest Reg'l Council of Carpenters*, 289 F.Supp.2d 1155 (C.D. Cal. 2003) (same).

[22] *DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,* 485 U.S. 568, 570-71 (1988).

tenants "had any contractual right to influence the selection of contractors"—promised that all mall construction would be done by contractors paying fair wages.[23]

Invoking the "constitutional avoidance" rule of statutory construction—that "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress"—the *DeBartolo* Court determined that the NLRB's finding that handbilling alone, peacefully and truthfully advising the public of the existence of a labor dispute, without picketing or patrolling, "poses serious questions of the validity of § 8(b)(4) under the First Amendment."[24]

The Supreme Court therefore held that to be consistent with the First Amendment, "more than mere persuasion is necessary to prove a violation" of Section 8(b)(4).[25] The Court rejected the notion that handbilling directed at a secondary employer with the goal of convincing the secondary to cease doing business with the primary employer is "coercion" under Section 8(b)(4) simply because it succeeds in causing the secondary employer to lose business.[26]

*DeBartolo* also demonstrates that it is legally insufficient to argue, as the Regional Director does here, that a union has the "improper" objective of trying to get the secondary employer (Mannix) to stop doing business with a primary employer (GTL). Such an *objective* is not "unlawful." After all, the Union in *DeBartolo* had just that objective: getting a tenant to stop using a non-union contractor that paid its workers substandard wages. To run

---

[23] *Id.* at 570.

[24] *DeBartolo*, 485 U.S. at 575.

[25] *Id.* at 578.

[26] *Id.* at 579-80.

afoul of Section 8(b)(4), a union must pursue that objective through *coercive conduct* such as picketing— rather than through persuasive speech or expressive activity.  If the Regional Director cannot demonstrate that Local 79 engaged in coercive conduct within the meaning of Section 8(b)(4) (and she cannot) the request for a TRO fails, regardless of whether Local 79 in its heart harbored a secondary objective.[27]

> **B.**  In the Thirty Years Since the Supreme Court's Decision in *DeBartolo,* the Courts Have Expanded the Expressive Activity Permitted Against Secondary Employers to Include, Among Other Things, the Use of an Inflated Rat

Since *DeBartolo,* the courts have applied its principles to permit expressive conduct similar to handbilling to avoid the First Amendment problem.

In *Tucker v. City of Fairfield*, the Court of Appeals for the Sixth Circuit held that "there is no question that the use of a rat balloon to publicize a labor protest is constitutionally protected expression within the parameters of the First Amendment."[28]

---

[27] *See also LIUNA, Local 872*, 363 N.L.R.B. No. 168, n.1 (April 29, 2016); *Carrier Air Conditioning Co. v. NLRB*, 547 F.2d 1178, 1189 (2nd Cir. 1976); *Capital Awning Co. v. Local 137 Sheet Metal Workers Int'l Ass'n*, 698 F.Supp.2d 308, 322-23 (E.D.N.Y. 2010); *Tru-Art Sign Co., Inc. v. Local 137 Sheet Metal Workers Int'l Ass'n*, 573 F.App'x 66, 67 (2d Cir. 2014).

[28] *Tucker v. City of Fairfield*, 398 F.3d 457, 462 (6th Cir. 2005) (affirming injunction preventing city from enforcement of city ordinance that prohibited structures in a public right-of-way). *See also Local 330 v. Town of Chute*, 834 F.3d 745, 751 (7th Cir. 2016) (citing *Tucker* and holding "[t]here is no doubt that the large inflated rubber rats widely used by labor unions to dramatize their struggles with employers are forms of expression protected by the First Amendment … The display of the rats is 'speech' in the amplified sense in which the Supreme Court has held for example that burning the American flag to dramatize opposition to a government policy is constitutionally protected speech"); *Virginia v. Black*, 538 U.S. 343 (2003) ("[t]he First Amendment offers protection to symbolic or expressive conduct as well as to actual speech"); *West Virginia Bd. of Educ. v. Barnette*, 319 U.S. 624, 632-33 (1943) ("[s]ymbolism is a primitive but effective way of communicating ideas").

In *State v. DeAngelo*, the Supreme Court of New Jersey found unconstitutional an effort to regulate the use of the rat balloon through a municipal sign ordinance.[29]

In *Sheet Metal Workers' International Association, Local 15 v. NLRB*, the D.C. Court of Appeals refused to enforce a Board Order that barred a union from staging a "mock funeral" procession outside a hospital, which the Board considered to be unlawful picketing of a secondary.[30]  The Court of Appeals held, however, that the procession "was a combination of street theater and handbilling" and was not the "functional equivalent" of picketing and therefore outside the scope of Section 8(b)(4).[31]  The union's activity had none of the "coercive" characteristics of picketing, did not physically or verbally "confront hospital patrons," nor "'patrol' the area in the sense of creating a symbolic barrier to those who would enter the [h]ospital."[32]

More recently, in *Microtech Contracting v. Mason Tenders District Council*, this District denied an injunction against a union's use of the inflated rat, noting "[i]t is abundantly clear that [the union] has a constitutional right to use an inflatable rat to publicize a labor dispute."[33]  This Court recognized that the use of the inflated rat generates "generalized economic

---

[29] *State v. DeAngelo*, 185 L.R.R.M. 3057 (Sup. Ct. N.J. 2009).

[30] *Sheet Metal Workers Int'l Ass'n, Local 15 (Brandon Regional Medical Center)*, 346 N.L.R.B 199 (2006), *enforcement denied*, 491 F.3d 429 (D.C. Cir. 2007).

[31] *Sheet Metal Workers' Int'l Ass'n, Local 15 v. NLRB*, 491 F.3d 429, 437-438 (D.C. Cir. 2007).

[32] *Id.*

[33] *Microtech Contracting v. Mason Tenders District Council*, 55 F.Supp.3d 381, 384 (E.D.N.Y. 2014).

disruption" but held that such disruption could not be relied upon to grant an injunction that would "completely eviscerate the First Amendment rights of the union."[34]

In fact, the courts' protection of the rat symbol may be beside the point to the Regional Director, because her NLRB Complaint at paragraphs 17 and 23 alleges that it was also illegal for the Union to have inflated a cockroach balloon.[35]  Unlike General Counsel Rosenfeld in the early 2000's who took particular issue with the message supposedly implicit in the inflated rat, this General Counsel appears to take the position that any secondary messaging by labor *writ large*, regardless of form, is the problem.  *DeBartolo*, again, holds just the opposite.

C.  Since Its Decision in *DeBartolo*, the Supreme Court's
      Protection of First Amendment Activity Has Only Increased

Since the Supreme Court's protection of the union's handbilling of secondary employers in 1988, the Court has issued at least two decisions that further expand the First Amendment's protection of expressive activity.

In 2003, in *Virginia v. Black*, the Supreme Court found a Virginia statute against cross burning unconstitutional because it established an undue presumption that the act of burning a cross was meant to intimidate.  Even when a person expressly advocates "the use of force," the state may not punish the person unless "such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."[36]

In 2011, in *Snyder v. Phelps*, the Supreme Court dismissed claims for infliction of emotional distress brought against the Westboro Baptist Church for a protest at the funeral of a

---

[34] *Id.*

[35] Petition at Exhibit 2 (Docket No. 1 at 18 of 71).

[36] *Virginia v. Black*, 538 U.S 343, 359 (2003).

gay marine killed in Iraq, where the Church had placards that said things like: "God Hates Fags," "Thank God for Dead Soldiers," and "God Hates You."[37]  That is what the family had to see at the funeral of their deceased Iraq War veteran son.  Affirming the dismissal of the emotional distress claim, the Supreme Court found speech in a "public place on a matter of public concern" "cannot be restricted simply because it is upsetting or arouses contempt."[38]

First Amendment protections of speech and assembly are thus so strong that it is illegal for a southern state to assume that people gathering together to burn a cross intend to intimidate anyone, and a church can upset a family mourning the loss of their son killed in combat.

It is therefore absurd to suggest that unions exercising their First Amendment right to peacefully publicize their dispute over the exploitation of workers must be enjoined from doing so to spare a supermarket from being shamed for entering a lease arrangement with its parent company pursuant to which workers are exploited.[39]  *Virginia v. Black* establishes that the government cannot presume the act of burning a cross in a southern state is meant to coerce other members of the community, but the Regional Director is arguing here that inflating balloons outside the parking lot of a supermarket is *necessarily* coercive.

---

[37] *Snyder v. Phelps*, 562 U.S. 443, 448 (2011).

[38] *Id.* at 458.

[39] *See* Petition at Exhibit 6 (affidavit of Mannix's District Manager stating that Mannix's "parent company, Wakefern, has a contract with the developer of the site, Kimco Realty Corp. to lease space for a supermarket at the new shopping center," and that Mannix "supplied Kimco with broad, general specifications concerning how to build the supermarket") (Docket No. 1 at 50 of 71).  Those specifications apparently did not include "make sure the construction workers building our future store are not paid substandard wages."

The Regional Director does not argue (because she cannot) that the issues being raised by Local 79 at the strip mall are not of commensurate public concern with those of racists in Virginia who might seek to express their historically violent contempt for Black people or homophobes in Maryland who wish to express their death-celebrative abhorrence at the sexual preferences of fallen soldiers.

Any argument that Local 79's issues are less important would not work for many reasons, especially in this Circuit.

In striking down an injunction against a picketing union in *Metropolitan Opera Association v. Local 100,* the Second Circuit vacated an injunction issued by the lower court that had prohibited it from "threatening or harassing" and "engaging in fraudulent or defamatory representations regarding the [Metropolitan Opera], its donors, officers, patrons, or directors."[40] The Court explained that "the Supreme Court has expressly afforded a special breadth of protection to union speech that publicizes labor conflicts."[41] Labor speech, for instance, is protected from claims of defamation to the same extent as publications in newspapers about public figures. Still citing Supreme Court law, the Court explained that speech that might even be *per se* illegal under state law is protected from sanction if it occurs in the context of a labor dispute, given that "intense, provocative speech is a common hallmark of American labor conflicts."[42] The Second Circuit reasoned:

> Labor disputes are ordinarily heated affairs; the language that is commonplace there might well be deemed actionable *per se* in some state jurisdictions. Indeed, representation campaigns are frequently characterized by bitter and extreme charges,

---

[40] *Metropolitan Opera Ass'n v. Local 100,* 239 F.3d 172, 174 (2d Cir 2001).

[41] *Id.* at 177.

[42] *Id.*

> countercharges, unfounded rumors, vituperations, personal
> accusations, misrepresentations and distortions. Both labor and
> management often speak bluntly and recklessly, embellishing their
> respective positions with imprecatory language.[43]

Far from distinguishing labor disputes from civil rights battles, the Court drew

analogies between the two movements (perhaps recognizing that they are one in the same

struggle). In dismissing the lower court's factual findings and condemning the tendency of the

injunction it issued to chill lawful speech, the Court was unconcerned with the union's

objectives, and in particular with whether the union "was motivated to coerce the Met through

social pressure and the threat of social ostracism."[44] The Second Circuit was similarly

untroubled by the lower court's finding that the union warned of "repercussions" against those

who did not join its boycott, such as leaflets condemning a small donor to the opera for refusing

to join the boycott.[45]

The Court explained:

> Especially within the labor context, in seeking to exert social
> pressure on the Met, the Union's methods may be harassing,
> upsetting, or coercive, but *unless we are to depart from settled
> First Amendment principles, they are constitutionally protected.*[46]

And more generally, any attempt by the Regional Director to "logically" separate

the concerns raised by Local 79 on the public sidewalks outside two Shop Rites from the kinds

---

[43] *Id.* (quoting *Linn v. United Plant Guard Workers*, 383 U.S. 53, 58 (1966)).

[44] *Id.* at 177.

[45] *Id.* at 177-78.

[46] *Id.* at 178 (citing *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 909-11 (1982) (holding that a boycott of white-owned businesses, including the use of "store watchers" who published names of those who entered boycotted businesses, was entitled to First Amendment protection); *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419 (1971)).

of public issues raised in *Virginia v. Black* or *Snyder v. Phelps* makes no sense.  Local 79's leaflets articulated a message regarding a regrettable new construction model Mannix Family Stores has adopted to get its latest Shop Rite built, one in which the laborers lack union representation and do not get anywhere near the compensation and training laborers who built previous Shop Rites received.  That is an expression of concern regarding the ways the economy distributes its rewards among its participants and about the training, and thus safety, of the people who build those physical spaces.

In short, it is not just that it is well-established law in the NLRB and federal courts that public speech *in general* can be incredibly confrontational and upsetting while remaining in the ambit of First Amendment protection.  Courts have afforded unions the highest level of latitude to draw attention to their message, with no content-based diminishment for speech on so-called "secondary" issues.

D.    To the Extent the Regional Director Seeks to Enjoin
      the Distribution of Leaflets, That Request Must Be Denied

In her Petition, the Regional Director twice alleges that the Union has distributed handbills to the public.[47]  The Petition, however, is unclear whether the Regional Director alleges that the Union has violated the NLRA through the distribution of leaflets, as opposed to by using the inflated balloons or conducting a rally on May 15.[48]

To the extent the Regional Director seeks to enjoin the distribution of leaflets, such an injunction is directly foreclosed by *DeBartolo*.

---

[47] Petition ¶ 8(q)&(s) (Docket No. 1).

[48] Petition ¶ 8(v) ("By the conduct described above in paragraphs 8(o) through 8(r), 8(t) and 8(u), Respondent has been violating Section 8(b)(4)(i) and (ii)(B) of the Act").  But paragraphs 8(q) and (s) contain the allegations regarding the leaflets and the Petition does not list those paragraphs as setting forth alleged violations of the Act.

And yet to the extent the Regional Director does not seek to enjoin the leafleting (because leafleting is legal), she only undercuts her argument that there is something inherently unlawful about secondary messages. The leaflets talked about Mannix, and Mannix is not the entity directly paying the construction laborers. The Regional Director's theory is unconstitutional regardless. One cannot respect *DeBartolo* but then advance an incredibly parsed reading of the case as somehow allowing secondary messages in leaflets but not by any other means. It is wholly irrational and unsupported to draw a distinction between messages delivered on 8.5 by 11 inch pieces of paper (*i.e.*, leaflets) and other ways of communicating (*e.g.*, inflated balloons). The infirmity of that position can perhaps best be grasped by considering what it would mean for messages delivered by other methods, such as vocalizations, e-mails, texts, Twitter, Facebook, newspapers, etc.

## IV.   A TRO AGAINST THE UNION HOLDING A RALLY ON A PUBLIC SIDEWALK IS EQUALLY IMPROPER

The First Amendment does not merely protect the Union's right to express its displeasure towards Mannix, it equally protects the union members' right to assemble.[49]

As the Supreme Court has recognized, the public streets and sidewalks "occupy a 'special position in terms of First Amendment protection' because of their historic role as sites for discussion and debate."[50] The streets and sidewalks "remain one of the few places" where a

---

[49] The First Amendment provides, in relevant part, that "Congress shall make no law… abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble."

[50] *McCullen v. Coakley*, 573 U.S. 464, 476 (2014) (holding that a Massachusetts statute violated the First Amendment as it made it a crime to knowingly stand on a public sidewalk within 35 feet of an entrance or driveway to any place, other than a hospital, where abortions were performed).

listener cannot simply "change the channel" to avoid "speech he might otherwise tune out."[51] Given the First Amendment's goal—"to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail"—the Supreme Court has explained that this characteristic of sidewalks "is a virtue, not a vice."[52]

Recognizing that the sidewalks are the "archetype of a traditional public forum," the court in *Venetian Casino Resort v. Local Joint Executive Board* affirmed the lower court's denial of an injunction when a casino sought to exclude union members from using the sidewalk for demonstrations against the casino.[53]  Indeed, the Board has recognized the right of unions to conduct rallies on the sidewalk, even rallies that involve more than 1,000 persons and last several hours.[54]

There is simply no support (and the Regional Director does not pretend to cite any) for the proposition that the mere presence of union members on a sidewalk constitutes unlawful "picketing" unless the members remain frozen in place like statues.

Nothing that happened on May 15, 2019 at the Union's lunch-time rally with about 20 members somehow converted the union members' constitutionally protected expressive conduct into a coercive "picket line."  There were not hundreds of members who participated in a rally hours long or on multiple days, and the Regional Director does not allege otherwise.

---

[51] *Id.*

[52] *Id.*

[53] *Venetian Casino Resort v. Local Joint Exec. Bd.*, 257 F.3d 937, 948 (9th Cir. 2001).

[54] *Venetian Casino Resort*, 345 N.L.R.B. 1061, 1061 (2005) (holding that casino violated the NLRA when it attempted a citizen's arrest of union agent for trespassing when he and other union members were on public sidewalk protesting casino's labor policies).

There was no patrolling, and the Regional Director does not allege there was. Indeed, attached to the Petition is the affidavit of Mannix's Director of Security that he witnessed the rally and the protesters "generally stood in the same place as they conducted their demonstration. [He] did not observe any members of the group pace back and forth."[55]

There were hardly any pedestrians even walking on the street near the Shop Rite store—customers almost always drive their cars to a Shop Rite—let alone any pedestrians who were blocked on the sidewalk. Neither the Regional Director's Petition nor the NLRB Complaint dated June 6 alleges there were any pedestrians blocked.[56] Again, attached to the Petition is the affidavit of Mannix's Director of Security that he witnessed the rally and "did not see any pedestrian come up that part of the street coming towards the Store during this demonstration."[57] As one ALJ recently held, a union's use of the rat against a secondary employer did not violate the NLRA, even if "there might have been some pedestrians who had to walk around the rat" as the rat's impact on the pedestrians "would have been de minimis."[58]

No protesters blocked or circled the parking lot's entrance, and the Regional Director does not allege they did.

---

[55] *See* Petition at Exhibit 5 at p. 2. (Docket No. 1 at 42 of 71).

[56] Although not specified in the Petition nor the NLRB Complaint, the Regional Director in her Memorandum of Law claims that on May 15 an undefined number of members of the "public"—not even alleged Shop Rite customers—walked in the road to get around a 20-25 person rally. NLRB Br. at 4. This single alleged instance—contradicted by the affidavit from Mannix's Director of Security who witnessed the rally—does not remotely warrant a TRO a month later.

[57] *See* Petition at Exhibit 5 at p. 2. (Docket No. 1 at 42 of 71).

[58] *IBEW, Local 98 (Shree Sai Siddhi Spruce)*, 2019 WL 2296952, n.6 (NLRB Div. of Judges, May 28, 2019).

There were no picket signs being carried, and the Regional Director does not allege there were.

And if any of these kinds of things had happened it would be alleged because someone (presumably from Mannix) was present across from the rally, videotaping the whole thing, and the union too videoed most of it.  In the union's video, you can see cars moving undisturbed in and out of the large grocery store parking lot.  Protesters do not try to speak to the shoppers arriving by car, let alone "confront" them.  The rally occurs midday, which is not when workers arrive and there is no indication that the protesters are there to speak to or make a specific address directed at Shop Rite employees.  They are there "shaming" Mannix Family Stores and Shop Rite to the public in general, which is their right.

And that is the crux of what the Regional Director is interested in enjoining—any shaming of Mannix.  But how business, and the economy more generally, treats workers is a deeply political subject the First Amendment fully protects.  The message of Local 79 (and the labor movement more generally) is that workers do not want to be treated as disposable objects in a commercial process, but as people.  Unions are entitled to voice that message peacefully in whatever public space they choose, including directly outside a business they believe is not living up to those standards.

The radicalness of the Regional Director's suggestion that the protesters and balloons should not be present on those sidewalks—at all, under effectively any circumstances—should not be lost on this Court.  That same sidewalk has Shop Rite banners on the perimeter fence facing the inflated rat.  Those banners advertise the bananas that await customers inside the store.  And, as noted, Mannix and the Regional Director argue as if it is a given that the sidewalks approaching the Shop Rite are there for a single purpose:  to get grocery shoppers to

their destination. But sidewalks are not only—or even principally—there to facilitate commerce. Local 79 and its members have a First Amendment right to publicize their own messages on public sidewalks, whether through protest balloons, leaflets, or peaceful rallies, to call attention to the ways workers are treated in the processes that bananas and other products get to Shop Rite's shelves (*e.g.*, the way the shelves and other parts of the stores get built).[59]

The Regional Director is not merely advancing a "novel" legal theory, she is advocating an Orwellian one. She is claiming for a federal administrative agency (the NLRB) the power to police the content of the undisputedly peaceful messages to which the public may be exposed as people go about their daily lives. She claims for the agency the authority to ban certain highly expressive images—like the inflated rat or maybe, so too, the inflated cockroach and leaflets—because the resulting messages are "ambiguous" and may "create[] the impression that Mannix has control over GTL's employment practices."[60] But neither Shop Rite nor the government are privileged to act as the diviners of meaning of symbols and speech which are neither false nor threatening—in order to ban the expressions because they are found to leave undesired "impressions" on a public assumed to only be travelling the sidewalks to shop. Shop Rite and the government's obvious aim here is to prevent the public from having impressions, receiving messages, or thinking thoughts regarding how unfairly the economy treats workers.

That is precisely the kind of government overreach that the First Amendment is meant to protect against.

---

[59] The Regional Director's application for a TRO has many exhibits but notably includes no photographs. Local 79 does not share her apparent shyness about showing the Court precisely what the TRO would enjoy as supposedly "coercive." *See* Exhibit A attached hereto.

[60] NLRB Br. at 11.

V.   EVEN UNDER GENERAL EQUITABLE
     PRINCIPLES, THE TRO IS UNWARRANTED

As the Second Circuit noted in *Silverman v. 40-41 Realty Associates*, "general equitable principles apply,"[61] even when the Regional Director seeks an injunction.

A.   The Requested TRO Is Vague and Overbroad

First, the Proposed TRO is unduly vague, as it largely just recites language of Section 8(b)(4) of the Act with the addition of "use of inflatable rats and cockroaches." For reasons set forth above, an injunction against the use of inflatable balloons is constitutionally infirm, particularly here given that the Regional Director's witnesses from Mannix admit that the Rat is not an impediment to traffic or pedestrians.[62] The Regional Director has cited absolutely no cases—and there are none—where a court, let alone on a motion for a TRO under Section 10(l) of the NLRA, has enjoined the use of symbolic objects as a form of expression.

Beyond that, given the novel interpretations the Regional Director is providing to words like "coercion" and "picketing," the remainder of the proposed TRO is so broad and ill-defined that it would leave Local 79 no way of understanding what expressive conduct, if any, it can permissibly engage in. In fact, the answer is almost certainly none (if perhaps with the exception of leaflets on appropriately sized paper). As such, the Proposed TRO violates well-

---

[61] *Silverman v. 40-41 Realty Assocs.*, 668 F.2d at 680.

[62] *See* Petition at Exhibit 4 at p. 2. (Docket No. 1 at 35 of 71) (affidavit of Mannix's Director of Security that the rat at the Hylan store is on the public sidewalk, about 70 yards from the doorway of the store and about 15 feet from the parking lot entrance); Petition at Exhibit 8 at p.4. (Docket No. 1 at 61 of 71) (affidavit of Mannix's Store Manager at Hylan that the rat is on the public sidewalk, and the protesters "from Local 79 positioned their inflated rats in such a way that they did not block the sidewalk on Hylan Blvd. or impede entrance into and out of the Hylan Store"); Petition at Exhibit 9 at p.4. (Docket No. 1 at 61 of 71) (affidavit of Mannix's Store Manager at Veterans that the rat is on the public sidewalk, about 150 yards from the store entrance and about 15 yards from the parking lot entrance).

established judicial principles against over-breadth in the issuance of injunctions, especially when applicable to matters of free expression.[63]

B.    The Regional Director Has Unduly Delayed in Her Request and
      Otherwise Fails to Show that Equity Calls for an Injunction to Issue

The Regional Director's delay belies any claim that a TRO is needed.[64]  The TRO seeks to prohibit the use of an inflated rat that Local 79 has used since April 29, the use of an inflated cockroach that Local 79 has used since May 15, and the holding of any rallies that Local 79 held a single time on May 15.[65]

Further, the Regional Director's request for injunctive relief is wholly undermined by any balancing of the equities.  On the one hand, there is the ability of members of society to express a dissenting, distinctly anti-commercial view in public, while on the other hand is Shop Rite's desire to be ignored for leasing space built for its occupancy by workers paid substandard

---

[63] *See Metropolitan Opera* Ass'n, 239 F.3d at 177; *Silverman v. Local 78, Asbestos Workers*, 958 F.Supp. 129, 135 (S.D.N.Y. 1996) ("As the Court agrees that the injunction proposed by the NLRB could have the effect of reaching even permissible conduct, it shall accordingly narrow the scope of the injunction"); 29. U.S.C. § 104(e) ("No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from … (e) *Giving publicity* to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence; (f) *Assembling peaceably* to act or to organize to act in promotion of their interests in a labor dispute") (emphasis added); *Jt. Bd. of Coat, Suit & Allied Garment Workers*, 494 F.2d at 1242 ("it seems particularly unlikely that Congress would have wished the courts to act so freely in granting injunctions theretofore forbidden in the Norris-LaGuardia Act of 1932, 29 U.S.C. § 104").

[64] *Ahmad v. Long Island Univ.*, 18 F.Supp.2d 245, 249 (E.D.N.Y. 1998) (denying preliminary injunction since plaintiff's motion was undermined by his delay in making it; delay "tends to indicate at least a reduced need for such drastic, speedy action").

[65] Petition at ¶¶ 8 (o), (p) & (q).

- 24 -

wages.[66]  After nearly a month of no rallying (the one and only rally having occurred on May 15), the Regional Director fears another might occur on a public sidewalk, and that shoppers and members of the general public will possibly observe protest balloons that are contrary to the experience Shop Rite wants to provide them.  But neither Shop Rite nor the NLRB has any right—in pursuing or protecting Shop Rite's distinctly *commercial* interests—to so control what gets expressed about the store on adjacent *public* property.

This Court is being petitioned to elevate a grocery store's commercial desire to provide a curated experience to its shoppers over the interests of labor in articulating a contrary message.  There is a distinction between commercial and labor speech, but in her request for a TRO the Regional Director reverses their priority, contrary to the First Amendment and well-settled Board law.

## CONCLUSION

Principles of law and equity demand that no TRO issue in this case.

Dated: June 18, 2019

Respectfully submitted,

By: */s/ Joseph J. Vitale*

Joseph J. Vitale
COHEN, WEISS AND SIMON LLP
900 Third Avenue, Suite 2100
New York, New York 10022-4869
Telephone:  (212) 356-0238
Facsimile:  (646) 473-8238
jvitale@cwsny.com

---

[66] In his Advice Memorandum in Case No. 13-CC-225655, *see supra* n.20, General Counsel Robb argues that the speech of labor is commercial in nature and therefore supposedly less protected than other forms of dissenting expression.  The Regional Director has not raised that point in her Petition, perhaps because the contention is so legally unsupported.

Tamir W. Rosenblum
Mason Tenders District Council
 of Greater New York
520 Eighth Avenue, Suite 650
New York, New York 10018

Counsel for Respondent Construction and
General Building Laborers Local 79

<u>CERTIFICATE OF SERVICE</u>

I, Joseph J. Vitale, hereby certify that on the 18th day of June 2019, a copy of the

Memorandum in Opposition to the Request for a Temporary Restraining Order was served

electronically via the CM/ECF system upon:

> Erin Schaefer
> National Labor Relations Board, Region 29
> Two Metro Tech Center, Suite 5100
> Brooklyn, New York 11201

*/s/ Joseph J. Vitale*
Joseph J. Vitale

# EXHIBIT A







