UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
KATHY DREW KING, Regional Director of
Region 29 of the National Labor Relations Board,
for and on behalf of the NATIONAL LABOR
RELATIONS BOARD                                          1:19-cv-03496-FB-LB

        Petitioner

   v.

CONSTRUCTION AND GENERAL BUILDING
LABORERS LOCAL 79, LABORERS
INTERNATIONAL UNION OF NORTH
AMERICA

        Respondent
----------------------------------------------------------------x

---

**MEMORANDUM OF LAW IN SUPPORT OF THE NATIONAL LABOR RELATIONS
BOARD'S MOTION FOR PRELIMINARY INJUNCTIVE RELIEF
PURSUANT TO 29 USCS § 160(l)**

---

James P. Anelli, Esq.
Robert M. Pettigrew, Esq.
**WHITE AND WILLIAMS LLP**
One Riverfront Plaza
1037 Raymond Boulevard, Suite 230
Newark, New Jersey 07102-5425
Tel.: 201. 368.7224

*Attorneys for the Charging Parties, Mannix Family
Market @ Hylan Blvd. LLC and Mannix Family
Market @ Forest And Richmond Ave. LLC*

## <u>TABLE OF CONTENTS</u>

STANDARD OF REVIEW ............................................................................................1

      1.     Legislative History .................................................................................1

      2.     Administrative Enforcement Scheme ....................................................3

      3.     Standard for Issuance of 10(l) Preliminary Injunctions ........................5

           (1)     Reasonable Belief ....................................................................5

           (2)     Just and Proper .......................................................................8

LEGAL ARGUMENT..................................................................................................10

      POINT I

      REASONABLE CAUSE EXISTS FOR THE REGIONAL DIRECTOR TO
      BELIEVE THAT RESPONDENT HAS VIOLATED THE ACT. .................................10

      POINT II

      THE GRANT OF THE BOARD'S REQUESTED RELIEF IS JUST AND PROPER
      UNDER EQUITABLE PRINCIPLES ..........................................................18

CONCLUSION............................................................................................................20

i

## TABLE OF AUTHORITIES

**Cases**

Ahearn ex rel. NLRB v. Freight Drivers, Helpers,
Dockmen & Allied Workers Local Union N. 375,
  1992 U.S. Dist. LEXIS 18870 (W.D.N.Y. Nov. 25, 1992) ........................................................ 4

Bennett ex rel NLRB v. Teamsters & Chauffeurs Union,
  459 F. Supp. 223 (S.D.N.Y. 1978) ........................................................................................ 2

Blyer v. N.Y. Coat, Suit, Dress, Rainwear & Allied Workers' Union,
  522 F. Supp. 723 (S.D.N.Y. 1981) ........................................................................................ 7

Douds v. Int'l Bhd. of Teamsters,
  156 F. Supp. 240 (S.D.N.Y. 1957) ........................................................................................ 5

Fuchs ex rel NLRB v. Teamsters Local Union,
  398 F. Supp. 243 (D. Conn. 1975) ........................................................................................ 6

IBEW, LOCAL 501 v. NLRB,
  181 F.2d 34 (2d Cir. 1950) .................................................................................................... 3

Kaynard ex rel NLRB v. Local 812, International Brotherhood of Teamsters,
  Chauffeurs, Warehouseman & Helpers,
  1971 U.S. Dist. LEXIS 15105 (S.D.N.Y. January 12, 1971) ................................................ 4

Kaynard ex rel NLRB v. Palby Lingerie, Inc.
  625 F.2d 1047 (2d Cir. 1980) ................................................................................................ 6

Kaynard v. Mego Corp.,
  633 F.2d 1026 (2d Cir. 1980) ................................................................................................ 6

Kaynard v. United Auto., Aerospace & Agric. Implement Workers,
  1980 U.S. Dist. LEXIS 16685 (E.D.N.Y. Oct. 28, 1980) ...................................................... 8

McLeod ex rel NLRB v. Bus. Mach., etc., Conference Bd.,
  300 F2d 237 (2d Cir 1962) .................................................................................................... 2

McLeod ex rel NLRB v. Intern. Brotherhood of Teamsters,
  345 F2d 142 (2d Cir 1965) .................................................................................................... 7

## <u>TABLE OF AUTHORITIES</u>
(Continued)

<u>McLeod ex rel NLRB v. Newspaper & Mail Delivers' Union</u>,
   209 F. Supp. 434 (S.D.N.Y. 1962) ........................................................................... 4

<u>N.L.R.B. v. Gissel Packing Co.</u>,
   395 U.S. 575 (1969).................................................................................................. 10

<u>Paulsen v. Renaissance Equity Holdings, LLC</u>,
   849 F. Supp. 2d 335 (E.D.N.Y. 2012) ..................................................................... 7

<u>Seeler v. Trading Port, Inc.</u>,
   517 F.2d 33 (2d Cir. 1975).......................................................................................... 9

<u>Silverman ex rel. NLRB v. Imperia Foods, Inc.</u>,
   646 F. Supp. 393 (S.D.N.Y 1986) ............................................................................ 7

## **STANDARD OF REVIEW**

1.    Legislative History

In 1947, Congress enacted the Taft-Hartley Amendments ("Labor Management Relations Act"), which added section 8(b)(4)(A) (the precursor to section 8(b)(4)(B)) of the National Labor Relations Act (the "Act") to proscribe secondary boycotting activities by a union that had previously been unlawful under the common law. See McLeod ex rel NLRB v. Bus. Mach., etc., Conference Bd., 300 F2d 237, 244 (2d Cir 1962) (holding that "[t]he abuse of secondary boycott practices was responsible for certain provisions in the Taft-Hartley Act"). Generally, a secondary boycott occurs when a union with a *primary* dispute against an employer chooses to indirectly pressure it by targeting that employer's neutral business associates, clients, suppliers, etc. through handbilling, picketing and/or other demonstration activities intended to exert economic pressure to force the neutral target to influence the outcome of its primary labor dispute. Senator Taft explained that the secondary boycott provisions were designed "to make 'it unlawful to resort to a secondary boycott to injure the business of a third person who is wholly unconcerned in the disagreement between an employer and his employer.'" Bennett ex rel NLRB v. Teamsters & Chauffeurs Union, 459 F. Supp. 223, 228 (S.D.N.Y. 1978) (quoting 93 Cong.Rec. 4198 (1947).

Indisputably, this legislation was in response to the grievous economic impact that secondary boycott activities impose on unarmed neutral targets, which lack any involvement in the labor dispute but are nevertheless enmeshed to it. Shortly after their passing, the Taft-Hartley amendments were amended by the Labor-Management Reporting and Disclosure Act to further reinforce protections for neutral third parties.  The Act now makes it an unfair labor practice for a union:

1

(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or

(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--

. . .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing.

29 USCS § 158(b)(4)(i)(ii)(B). Thus, the Act's secondary boycott prohibitions focus on both the union's secondary (i) *conduct* and (ii) *object*.[1]

Notably, section 8(b)(4) withstood numerous constitutional challenges that it abridged a union's rights to free speech and expression under the First Amendment of the United States Constitution. Indeed, the Second Circuit specifically upheld the constitutionality of the secondary boycott provisions, which was affirmed by the United States Supreme Court. See IBEW, LOCAL 501 v. NLRB, 181 F.2d 34, 40 (2d Cir. 1950) (observing that "no constitutional doubts can arise as to the validity of Sec. 8(b)(4) when applied to the facts at bar" and that "[i]t never has been held, save by the most extreme partisans, if indeed even by them, that the First Amendment protected all verbal acts as such"), aff'd IBEW v. NLRB, 341 U.S. 694 (1951). Further reinforcing the constitutionality of the secondary boycott provisions, the Supreme Court held:

---

[1] Because Respondent's targeting of the Charging Parties and their status as neutral third parties to the underlying labor dispute here is not in dispute, this factor is not addressed herein.

> The prohibition of inducement or encouragement of secondary pressure by § 8(b)(4)(A) carries no unconstitutional abridgment of free speech. The inducement or encouragement in the instant case took the form of picketing followed by a telephone call emphasizing its purpose. The constitutionality of § 8(b)(4)(A) is here questioned only as to its possible relation to the freedom of speech guaranteed by the First Amendment. This provision has been sustained by several Courts of Appeals. The *substantive evil condemned by Congress in § 8(b)(4) is the secondary boycott and we recently have recognized the constitutional right of states to proscribe picketing in furtherance of comparably unlawful objectives. There is no reason why Congress may not do likewise.*

IBEW, 341 U.S. at 705 (emphasis added). It is against this backdrop that Respondent's constitutional arguments must be evaluated as applied to the use of the giant rat and cockroach inflatables outside of a supermarket.

    2.    Administrative Enforcement Scheme

Congress charged the National Labor Relations Board ("Board") with the overall enforcement of the Act, and more specifically, the secondary boycott protections under section (b)(4). McLeod ex rel NLRB v. Newspaper & Mail Delivers' Union, 209 F. Supp. 434, 438 (S.D.N.Y. 1962) (observing that the "ultimate determination with respect to unfair labor practices has been placed by Congress with the Board"). In aid of its congressional authority, the Board, *and only the Board*, is authorized to seek injunctive relief in order to restrain unfair labor practices during the pendency of its administrative proceedings. See 29 USCS § 160(j), (l); see also Kaynard ex rel NLRB v. Local 812, International Brotherhood of Teamsters, Chauffeurs, Warehouseman & Helpers, 1971 U.S. Dist. LEXIS 15105, *9 (S.D.N.Y. January 12, 1971) (observing that "[s]ince the Board has jurisdiction of the unfair labor practice charges, the court has jurisdiction to issue an injunction *in aid of* the Board's power") (emphasis added); Ahearn v. Freight Drivers, 1992 U.S. Dist. LEXIS 18870, *22 (W.D.N.Y. 1992) (observing that "[i]t is well settled that primary jurisdiction to adjudicate actions arising from alleged violations of the

Act rests with the National Labor Relations Board"). Thus, Congress granted this authority to the Board as a *tool* to "not only to protect the public welfare but to preserve the integrity of the procedure before the Board." <u>Newspaper & Mail Delivers' Union</u>, 209 F. Supp. at 438. "Congress . . . realized that plenary hearings before the Board on such charges often are time-consuming; that it would take additional time, even after the [Board's] decision, to achieve enforcement through the appropriate Court of Appeals; and that speedy action is required in many secondary boycott cases." <u>Douds v. Int'l Bhd. of Teamsters</u>, 156 F. Supp. 240, 246 (S.D.N.Y. 1957).

Because secondary boycott violations and their impact on neutral third parties are especially egregious violations of the Act, Congress has afforded them special status.  First, Congress distinguishes the particularly grievous nature of secondary boycott violations from other unfair labor practices under the Act by requiring that the Board give these charges "priority" in their investigation and enforcement proceedings. 29 USCS § 160(l) (requiring that "the preliminary investigation of such charge shall be made forthwith and given *priority* over all other cases except cases of like character in the office where it is filed or to which it is referred") (emphasis added). Senator Taft explained:

> Section 10(l) makes it mandatory upon the Board to petition for injunctive relief in the case of strikes or boycotts that are alleged to constitute unfair labor practices within the meaning of paragraphs (A), (B), and (C) of section 8(b)(4). Moreover, cases of this type are to be given priority, and when the Board agent charged with the investigation has reasonable cause to believe that the charge is true and that a complaint should be issued, he is required to petition the district court for appropriate injunctive relief pending final adjudication by the Board.

<u>See</u> 1 Legislative History of the Labor Management Relations Act, 1947, 130-32. These factors clearly distinguish Section 10(i) proceeding from run-of-the-mill injunctive relief sought by

23010536v.1

private litigants. See, e.g., Fuchs ex rel NLRB v. Teamsters Local Union, 398 F. Supp. 243, 245 (D. Conn. 1975) (observing that "[i]t is essential at the outset to note the bounds which have been set, by the statute and the judicial construction thereof, on this Court's function in a § 10(l) proceeding"). Second, the authority to seek preliminary injunctive relief during the pendency of unfair labor practice proceedings takes two forms: discretionary preliminary injunctive relief under section 10(j) and *mandatory* preliminary injunctive relief under section 10(l). Compare 29 USCS § 160(j) with See 29 USCS § 160(l). Notwithstanding the vast authority vested in the Board with regard to the enforcement of the Act, *Congress deemed it vital to remove any discretion in seeking injunctive relief for secondary boycott violations* due to the devastating impact they have on neutral third parties. See 29 USCS § 160(l).

      3.      Standard for Issuance of 10(l) Preliminary Injunctions

Pursuant to section 10(l), an injunction will issue if, after a preliminarily investigation of a unfair labor practice charge, the Regional Director "has *reasonable cause to believe* such charge is true and that a complaint should issue" and "[u]pon the filing of any such petition the district court shall have jurisdiction to grant such injunctive relief . . . as it deems *just and proper*." 29 USCS § 160(l). Based on the foregoing, the standard for section 10(l) proceedings in this circuit is two-fold: (1) Whether the Board has "reasonable cause to believe" that an unfair labor practice has been committed and, if so, (2) whether the issuance of such injunction is "just and proper." Kaynard ex rel NLRB v. Palby Lingerie, Inc. 625 F.2d 1047 (2d Cir. 1980).

      (1)      Reasonable Belief

It is well-settled that the Board, as "the expert agency established by Congress," is entitled to considerable deference in the initial prong of this test. Kaynard v. Mego Corp., 633 F.2d 1026, 1035 (2d Cir. 1980). That is, "[t]he standard for issuing a section 10(l) injunction

*requires* the district court to defer to the NLRB's preliminary determination of reasonable cause to believe that a picketing union . . . is committing an unfair labor practice." <u>Blyer v. N.Y. Coat, Suit, Dress, Rainwear & Allied Workers' Union</u>, 522 F. Supp. 723, 726-27 (S.D.N.Y. 1981) (emphasis added). Importantly, the Second Circuit "has recognized that the regional director's resolution of disputed issues of law and fact should be accorded *considerable deference* in determining the issue of reasonable cause." <u>Ahearn ex rel. NLRB v. Freight Drivers, Helpers, Dockmen & Allied Workers Local Union N. 375</u>, 1992 U.S. Dist. LEXIS 18870, *14 (W.D.N.Y. Nov. 25, 1992) (emphasis added). Rather than decide the underlying issues during a section 10(l) proceeding, the Court's "role is limited to determining whether there is 'some significant possibility'" that a secondary boycott violation occurred. <u>Teamsters & Chauffeurs Union</u>, 459 F. Supp. at 232 (quoting <u>Danielson v. Jt. Bd. of Const. Suit Allied Gourmet Workers</u>, 494 F.2d 1230, 1244 (2d. Cir. 1974); <u>see also</u> <u>McLeod ex rel NLRB v. Intern. Brotherhood of Teamsters</u>, 345 F2d 142, 145 (2d Cir 1965) (holding that "[w]hen an application for injunction is made under Section 10(l) the district court does not have the duty of deciding whether an unfair labor practice has been committed"). This deference is due to the requirement that "the district court must not substitute itself for the Board by holding a full-fledged trial and making definitive factual findings." <u>Blyer</u>, 522 F. Supp. at 725-26. Rather, the Board is merely required to demonstrate reasonable cause exists to *believe* a violation of section 8(b)(4) occurred.

Importantly, the deference owed to the Board applies to both factual issues and legal interpretations of the Act. Thus, "in making the 'reasonable cause' determination, the district court properly gives the Regional Director's position on both the facts and law great weight." <u>Silverman ex rel. NLRB v. Imperia Foods, Inc.</u>, 646 F. Supp. 393, 398 (S.D.N.Y 1986). With regard to disputed issues of fact or credibility, "Regional Director may assume these in favor of

the charge and the District Court should sustain him if his charge is *within the range of rationality*." Id. (quoting Danielson, 494 F.2d at 1245) (emphasis added); see also Paulsen v. Renaissance Equity Holdings, LLC, 849 F. Supp. 2d 335, 353 (E.D.N.Y. 2012) (observing that "the Regional Director should be 'given the benefit of the doubt' and all factual inferences should be drawn in his favor if the inference is 'within the range of rationality'"); Kaynard v. United Auto., Aerospace & Agric. Implement Workers, 1980 U.S. Dist. LEXIS 16685, *2 (E.D.N.Y. Oct. 28, 1980) (observing that where "'reasonable cause to believe' turns on disputed issues of fact, the Regional Director may assume these in favor of the charge and the district court should sustain him if his choice is within the range of rationality").

Likewise, issues concerning the interpretation or application of section 8(b)(4) should be resolved in the Board's favor. See, e.g., Teamsters & Chauffeurs Union, 459 F. Supp. at 225 (granting "the Board's interpretation of the relevant law the deference it is due in a § 10(l) proceeding"). The Second Circuit has mandated that "even on an issue of law, the district should be hospitable to the views of the [Regional Director], *however novel*." Silverman, 646 F. Supp. at 398 (quoting Danielson, 494 F.2d at 1245) (emphasis added); see also Mego Corp., 633 F.2d at 1031 (applying the "range of rationality" test "even on issues of law"). This deferential standard is also appropriate where legal precedent is not free from conflict. The Second Circuit observed that "the Regional Director is not required to show . . . that the precedents governing the case are in perfect harmony, but only that there is 'reasonable cause to believe that a Board decision finding an unfair labor practice will be enforced by a Court of Appeals.'" Id. at 1033. Simply put, this Court must be firmly "convinced that the legal position of the Regional Director is wrong" to deny section 10(l) injunctive relief. Id.

(2)    <u>Just and Proper</u>

Under the second prong of this test, the grant of injunctive relief under section 10(l) must be in accordance with the general rules of equity. <u>Danielson</u>, 494 F.2d at 1242-44. However, the Second Circuit has tempered the application of these equitable principles in section 10(l) proceedings by observing that "legislative provisions calling for equitable relief to prevent violations of a statute require the courts to act in accordance with traditional equity practice 'as conditioned by the necessities of the public interest which Congress has sought to protect.'" <u>Seeler v. Trading Port, Inc.</u>, 517 F.2d 33, 39-40 (2d Cir. 1975). Moreover, "[t]he Second Circuit and district courts within this Circuit have outlined the numerous factors to be considered in determining whether the relief requested by the Board is 'just and proper,'" none of which appear to be dispositive." <u>Ahearn</u>, 1992 U.S. Dist. LEXIS at 17.

Nevertheless, courts seemingly look most often at irreparable harm, preservation of the status quo during the pendency of the Board's administrative proceedings and the efficacy of the Board's ultimate determination when applying equitable principles in section 10(l) proceedings. Irreparable harm may viewed through the prism of either the employer and/or the general public. <u>See</u>, <u>e.g.</u>, <u>Bennett</u>, 459 F. Supp. at 233 (finding that section 10(l) relief was "just and proper" due to the impact on the neutral parties). Moreover, the proportionality of the harm suffered by the neutral party and the primary employer should be factored under this equitable test. Noting an incongruity in the potential harm to the neutral parties and the primary employer, the district court in <u>Bennett</u> observed:

> As we have noted, the picketing here could bring tremendous pressure to bear upon a handful of neutral franchisees or at least upon a handful of them at any given time with correspondingly little impact upon the primary employer, Carvel. In light of the severity of the potential harm to the few affected franchisees, we find equitable relief to be both just and proper.

Id. As it relates to harm to the public, "the courts are required to consider whether such injunction will further public interest in *maintaining respect for the law* and promptly eliminate obstructions to free flow of commerce." Ahearn, 1992 U.S. Dist. LEXIS at 18 (emphasis added). Thus, an ongoing flagrant violation of section 8(b)(4)(B) is sufficient to trigger the public interest prong as it relates to the uniform enforcement of federal labor law.

With regard to the preservation of the status quo, the Second Circuit has ruled "that the effect on the status quo is an important consideration in deciding whether equitable relief is 'just and proper.'" Seeler, 517 F.2d at 38.  Importantly, the Court of Appeals observed:

> [T]he status quo which deserves protection under § 10(j) is not the illegal status quo which has come into being as a result of the unfair labor practices being litigated. Instead, section 10(j) was intended as a means of preserving or restoring the status quo as it existed before the onset of unfair labor practices.

Id. The Court of Appeals further noted that "it is essential not to freeze the present situation, but rather to 're-establish the conditions as they existed before the employer's unlawful campaign." Id. (quoting N.L.R.B. v. Gissel Packing Co., 395 U.S. 575, 633 (1969).) This rationale applies with equal force in a section 10(l) proceeding involving a secondary boycott violation. The preservation of the status quo requires the condition that existed prior to the unlawful secondary boycott activities. That is, "[t]hose previous conditions constitute the status quo which the courts should restore." Id. at 38-39. Otherwise, "the situation is subject to change to the point at which any order of the Board would come 'too late to prevent [the offending party] from obtaining its objectives by unfair labor practices." Silverman, 646 F. Supp. at 400.

"Finally, the district court must factor in the purpose of the Act and decide whether the failure to issue the injunction, in effect, will nullify or render meaningless the Board's final determination." Ahearn, 1992 U.S. Dist. LEXIS at 19. In this context, the Court should

determine whether the grant of injunctive relief is necessary "to preserve the integrity of the procedure before the Board." <u>Newspaper & Mail Delivers' Union</u>, 209 F. Supp. at 438.

## LEGAL ARGUMENT

### POINT I

### REASONABLE CAUSE EXISTS FOR THE REGIONAL DIRECTOR TO BELIEVE THAT RESPONDENT HAS VIOLATED THE ACT

In analyzing whether reasonable cause exists, this Court must determine whether there is "some significant possibility that the Board will enter an enforceable order." <u>Danielson</u>, 494 F.2d at 1244. The Court's inquiry is a limited one as the issue is whether the Board has reasonable cause to believe that Local 79 violated the Act's provisions, here, specifically, Section 8(b)(4)(i)(ii)(B). If the Court determines reasonable cause exists based on the Board's interpretation of the facts, it should then determine what equitable relief is "just and proper" under the circumstances by factoring the unique circumstances underlying a section 10(l) injunction.

As noted in the Board's Memorandum of Law, the District Court is not called upon to resolve issues of credibility; however, here there are no disputed material facts identified in Local 79's submissions to the Court. Beginning on or about April 29, 2019 and continuing to date, Local 79 has targeted the Charging Parties by engaging in a continuous and widespread campaign to both sow discord among their union employees and to inflict economic harm on their grocery stores. Its efforts were enabled by way of its false narrative, <u>i.e.</u> that their owner/operator (Kevin Mannix) was somehow exploiting workers through substandard wages being paid to non-union workers concerning construction underway at "The Boulevard" shopping center in Staten Island.  In fact, Local 79's handbills drew a direct connection between

Mannix and their labor dispute even though it is undisputed that Mannix has no control over wages and/or working conditions at The Boulevard construction project.  That is, it is undisputed that Mannix is not a party to The Boulevard construction project and, therefore, has no involvement whatsoever with this labor dispute or the property developer (Kimco Realty) or Kimco Realty's general contractor (GTL Construction).

As part of this unlawful secondary boycott campaign targeting The Charging Parties, Local 79 has regularly erected multiple inflatable rats and cockroaches at two grocery store locations, in one case just 15 feet from the entrance to the store's parking lot. Such inflatables stand between 10-15 feet tall and attached to them is a handbill stating: "Shame on You Kevin Mannix . . . [he] is standing by while Kimco Realty Corp. has GTL Construction build his new ShopRite *using exploited construction workers*". These inflatable rats by no means resemble cartoon caricatures nor are they intended to.  Instead, they are *designed* to appear intimidating, vicious and predatory in nature, having extremely sharp claws and multiple fangs that are not even natural for this animal. In a prone position, their mouths are open and claws are extended creating the impression that they are about to violently devour something. (A true and correct photo of two such rats at a Charging Party's location is attached hereto as Ex. 1.)[2] The inflatable cockroach is no less menacing and coercive particularly given the fact that the Charging Parties are grocery stores.  The placement of these large inflatables next to the entrance way used by store customers is intimidating as it is *intended* to be in order to attract maximum attention and inflict maximum economic harm. Further, they have a universal meaning attached to them that leads both the public and store employees to believe that Mannix is responsible for their labor dispute as intimated Local 79's false handbills.

---

[2]  This photo appeared in the Staten Island Advance periodical, which is available online at https://www.silive.com/news/2019/06/unions-inflatable-rat-protests-spur-legal-battle-over-right-to-protest.html.

11

In addition to false handbilling and use of the inflatables, Local 79 also assigned some 20 to 25 agents to engage in a rally at a store location on or about May 15, 2019, shortly after the Charging Parties filed their charge with the Board.  Importantly, any "picketing of a neutral employer constitute[s] a prohibited secondary boycott" as a matter of law.  NLRB v. Local 3, IBEW, 542 F.2d 860, 867 n.26 (2d Cir. 1976); see also NLRB v. Retail Store Employees, 447 U.S. 607 (1980) (holding that consumer picketing urging a secondary employer to sever relations with the union's real antagonist is forbidden under section 8(b)(4)).   Using bullhorns and whistles, the demonstrators yelled chants at the store, which included references to previously beating injunctions and shutting down the store if their demands were not met by the property developer of The Boulevard project.  This rally took up the entire walkway of the sidewalk adjacent to the store thereby blocking pedestrians and/or store customers from passing.  Their chants were easily heard from within the grocery store by both store customers and the store's unionized store employees.  This conduct clearly ran afoul of section 8(b)(4).

Local 79's goal is simple: sow discord among Mannix's union employees and store patrons in order to inflict economic harm on a neutral third party with no involvement whatsoever in their labor dispute.  Thus far their mission has been successful.  In addition to the inflatables, they have distributed knowingly false handbills to both store employees and patrons. They have further targeted store employees by intentionally lying to two employees that the new store being constructed at The Boulevard site will be non-union, which they knew to be completely false. This malicious statement was made solely for the sole purpose of creating labor strife between Mannix and its employees, which are represented by two local unions.  The irony here is that the Charging Parties have always maintained good relations with their workforce, which is overwhelmingly unionized.  The totality of the above actions are clearly intended to

intimidate, rather than persuade, the Charging Parties in order to bend them to the union's will. Such activity which, by design, is *meant* to be intimidating is not constitutionally protected.  <u>See DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council</u>, 485 U.S. 568, 580 (1988) (distinguishing between intimidation and mere persuasion for purposes of violating section 8(b)(4).  In sum, Because Local 79's activities were designed to economically harm a neutral party and its actions are designed to intimidate and coerce rather than persuade, they constitute unlawful secondary boycott activity.  <u>Id.</u>

The question that arises is why did Local 79 target the Charging Parties given that Mannix has absolutely no control whatsoever over working conditions at The Boulevard project? The answer is simple.  Local 79 wants to somehow use Mannix as a sword in its labor dispute with the property developer at The Boulevard project. In fact, Mannix appears to be the only store, of more than thirty to be built, that will be unionized at The Boulevard site. This is precisely why Local 79 chose Mannix's locations for its unlawful picketing activities.  Its design is to encourage the Charging Parties' unionized workers to support its labor dispute, which explains why it has actively attempted to make Mannix the center of this labor dispute in its handbills and picketing activities.

In the final analysis, these secondary boycott activities against a neutral party are nothing more than an unlawful attempt to gain leverage in an ongoing and wholly unrelated labor dispute. Local 79 is frustrated with its exclusion from The Boulevard project. Its efforts are clearly designed to target Mannix, and his purportedly "shameful" actions, in order to inflict economic harm thereby gaining leverage in The Boulevard labor dispute. In fact, when Local 79 was asked what it demanded in order to cease its unlawful secondary boycott activities, it had the

audacity to demand _all_ of Kimco Realty's construction work throughout all of New York City going forward. (See sworn Statement of Erik Bray, ¶ 5.)[3]

The question presented here is whether Local 79's conduct, when viewed collectively, provide reasonable cause for the Regional Director to believe that there is a violation of the Act. See Mego Corp., 633 F.2d at 1033.  In so determining this issue, it is critical that _all_ of Local 79's actions be viewed collectively, and not in a vacuum. Moreover, it is well-settled that the Board is entitled to deference with respect to all factual inferences and legal conclusions applying section 8(b)(4).  See Silverman, 646 F. Supp. at 398.  When viewed in this light, there is little question that the Regional Director's actions are entirely justified and in conformity with the Act.

For example, this matter presents following elements of _both_ picketing and non-picketing coercive activity:

- Extensive confrontational picketing occurred with respect to some 20 to 25 Local 79 agents, on May 15, when they blocked the public sidewalk with a massive rat and cockroach in front of a Mannix grocery store, made threats to "shutdown" the store if their demands were not met, and otherwise chanted, in unison, (no different than any picket line), what they wanted on a recurrent basis over bullhorns directed at patrons and store employees;

- Erection of multiple inflatables at two of Mannix's store locations which are clearly designed to intimidate and coerce Mannix along with signaling to his unionized employees of the existence of a labor dispute, which simultaneously included handbills (one of which is affixed to the inflatables) asserting that

---

[3] Attached hereto as Exhibit No. 2.

Mannix is responsible for "exploited contractor workers" and allowing "substandard wages" to be paid on The Boulevard project;

- Multiple union agents attend to these rats and cockroaches on a continuous basis at two of Mannix's grocery stores as close as 15 feet from the entrance to one of the grocery stores;

- Local 79 targeted Mannix's employees with misleading handbills while making a false statement that Mannix's new grocery store will somehow suddenly become non-unionized in a direct effort is to create discord among his union employees.

Collectively, these actions cannot constitute either peaceful protests or persuasive activity but, rather, constitute active picketing and coercive secondary activities designed solely to bring about an unlawful result: economic harm to the Charging Parties in order to gain leverage in the union's primary dispute. There simply is no persuasion or expression here but, instead, tactics designed to intimidate and coerce.  See DeBartolo Corp., 485 U.S. at 580.

Similarly, the inflatable rats and cockroaches at multiple locations are designed to signal a message to the union workers that a labor dispute involving a sister union is occurring that they should support.  Such support was further encouraged by targeting union workers with these false handbills.  The use of these inflatables constitutes a modern day picket line and the only logical inference to be drawn for the placement of these inflatables is the continuing harm to Mannix to gain leverage. Under these circumstances, the Regional Director could reasonably conclude that the Act has been violated.

This is particularly true here since the very purpose of section 10(l) proceedings, in which the Board is mandated to seek an injunction, is to fulfill Congress's intent that innocent neutral employers should not become embroiled in third-party labor disputes, thereby suffering

15

economic harm.  See Bus. Mach., etc., Conference Bd., 300 F2d at 244.  Indeed, the Charging Parties have already sustained irreparable economic harm as a direct result of Local 79's continued unlawful actions and Local 79 has made it clear that they have no intention of ceasing their actions.  This is further exacerbated by the fact that the Charging Parties, like most grocers, have extremely low profit margins and hence even a small reduction in overall revenue has a very significant impact on overall net profits.  Mannix has already experienced declining revenues and there is no indication of such unlawful actions will cease until the Court steps in to enjoin this unlawful secondary boycott activity while Board proceedings take place.

While Local 79 takes the position that their activities are somehow protected under prior Board decisions, they misrepresent both the scope and intent of this precedent.  No Board precedent contains *all* of the factual elements present here.  Moreover, no Board precedent has created a *per se* rule with regard to the use of an inflatable in a secondary context.[4]  Rather, the Board is free to consider what *collective* activities, coupled with the clear inference to be drawn from those activities, constitute an unlawful secondary boycott. There simply is no legal precedent that suggests any form of handbilling and/or use of rat inflatables is immunized under section 8(b)(4). In this matter, there exists a potent combination of defamatory statements, coercive/intimidating conduct and full blown picketing activity all with the single aim of causing grievous economic injury to a neutral party to support the Regional Director's reasonable belief. Clearly, the Board, in its role as "the expert agency established by Congress," should be afforded

---

[4] To the extent Local 79 relies on the Board's decision in Brandon II for this proposition, it is misplaced.  See Sheet Metal Workers Int'l Ass'n, 356 N.L.R.B. 1290 (N.L.R.B. May 26, 2011).  First, Brandon II did not involve section 8(b)(4)(i)(B) activity aimed at the neutral party's employees.  Second, irrespective of their wisdom, the majority merely applied the facts to its case finding that a *single* inflatable under the circumstances was not sufficiently confrontational to violate section 8(b)(4)(ii)(B)  Id.. By no means did the Board create a *per se* rule regarding the use of inflatables *in any context*. Id. at 1294 (holding that "[i]t may be that the size of a symbolic display combined with its location and threatening or frightening features could render it coercive within the meaning of Section 8(b)(4)(ii)(B)").

deference as to its determination that these activities are meant primarily to intimidate and coerce.  Mego Corp., 633 F.2d at 1035.  It is within the province of the Board to determine where to "draw-the-line" when confronted with factual determinations consisting of multiple elements of coercive and intimidating secondary activity *within the range of rationality*.  See, e.g., Silverman, 646 F. Supp. at 398; Paulsen, 849 F. Supp. 2d at 353; United Auto., Aerospace & Agric. Implement Workers, 1980 U.S. Dist. LEXIS at 2.

In sum, these activities provide a compelling basis for injunctive relief to prevent harm to a neutral parties under the Act. The Board is entitled to determine what factual circumstances give rise to a section 8(b)(4) violation when numerous secondary elements are present. Moreover, the Board is free to recalibrate its controlling standards in evaluating these activities under the Act in its role as the agency charged with its enforcement.  See, e.g., UPMC, 2017 NLRB LEXIS 597, *41, 365 NLRB No. 153 (N.L.R.B. December 11, 2017) (observing that "'[i]t is a fact of life in NLRB lore' that the Board's interpretation of the Act will 'invariably fluctuate with the changing compositions of the Board'") (quoting Epilepsy Foundation of Northeast Ohio v. NLRB, 268 F.3d 1095, 1097 (D.C. Cir. 2001)).[5]  In doing so, the Board is simply following its legislative mandate to protect neutral parties who become enmeshed in other parties' labor disputes, but nevertheless suffer economic harm. See Bus. Mach., etc., Conference Bd., 300 F2d at 244.  Conversely, Local 79's contention that their actions are somehow immune from scrutiny is simply erroneous and in contravention of the Act's prohibitions on secondary boycotts.

---

[5] Case in point, the current Board has recently overruled several significant legal tests under the Act, such as the standards for workplace rules (Boeing Co., 2017 NLRB LEXIS 634 365 NLRB No. 154 (N.L.R.B. December 14, 2017)), independent contractor status (SuperShuttle DFW, Inc., 2019 NLRB LEXIS 15, 367 NLRB No. 75 (N.L.R.B. January 25, 2019)) and the public space exception (UPMC Presbyterian Hosp., 2019 NLRB LEXIS 346, 368 NLRB No. 2 (N.L.R.B. June 14, 2019)) to name a few.

17

## POINT II

## THE GRANT OF THE BOARD'S REQUESTED RELIEF IS JUST AND PROPER UNDER EQUITABLE PRINCIPLES

It is clear that Local 79 will continue its unlawful secondary actions unabated during the pendency of the Board's administrative proceedings if not enjoined. During this time, Mannix will likely incur continuing economic harm, and given the low margin that exists in the grocery industry, such a delay would inflict irreparable harm on the Charging Parties *as there is no adequate remedy available from the Board in this regard*. The overall intent of the Act's secondary boycott provisions was to prevent this precise scenario from occurring through section 10(l) injunctions. See, e.g., Newspaper & Mail Delivers' Union, 209 F. Supp. at 438 (observing that "plenary hearings before the Board on such charges often are time-consuming . . . and that speedy action is required in many secondary boycott cases"); Douds v. Int'l Bhd. of Teamsters, 156 F. Supp. 240, 246 (S.D.N.Y. 1957) (observing that Congress granted the Board authority to seek injunctive relief "to preserve the integrity of the procedure before the Board"). Further, injunctive relief is required here for no other reason than there is a continuing violation of section 8(b)(4). See Ahearn, 1992 U.S. Dist. LEXIS at 18 (observing that section 10(l) injunctive relief is intended to "further public interest in maintaining respect for the law"). Hence, the requested relief is just and proper under traditional equitable principles.

In balance, Local 79 will remain free to conduct picketing activities at the primary site, i.e., The Boulevard project site. Notably, the Act does not restrain such activities when they are limited to the primary employer. See, e.g., Service Employees Local 87 (Trinity Maintenance), 312 NLRB 715, 742 (1993) (observing that "while Section 8(b)(4)(B) of the Act leaves unfettered a labor organization's traditional right to engage in direct action against an employer, with which it is engaged in a primary labor dispute, including the right to induce the primary

23010536v.1

employer's employees to engage in a strike or refusal to handle goods, the provision's more 'narrowly focused' purpose is to 'restrict the area of industrial conflict insofar as this could be achieved by prohibiting the most obvious, widespread, and … dangerous practice of unions to widen that conflict' and coerce neutral employers not concerned with the primary dispute"). Instead, it has chosen to "camp out" at the Charging Parties' locations in order to create discord among their union workers and ultimately gain leverage over Kimco Realty and GTL Construction, who Mannix has absolutely no control over. Thus, there is no irreparable harm to Local 79 by ordering the Board's requested relief.

Moreover, an injunction at this time will preserve the status quo as it existed *before* the onset of Local 79's unfair labor practices in order to prevent *further* irreparable harm to the Charging Parties. See Seeler, 517 F.2d at 38-40.  An injunction will also enable the Board to make a meaningful final determination and remedy. Conversely, the continuation of Respondent's ongoing violation of section 8(b)(4) may result in any final determination months from now being meaningless.  Also, this scenario will not serve the public good or the congressional mandate that gives section 8(b)(4) violations priority and *requires* that injunctive relief be sought.  See Ahearn, 1992 U.S. Dist. LEXIS at 18.  Indeed, the failure to issue an injunction under these circumstances will only encourage Local 79 to engage in further secondary boycott violations.

Finally, there is no "public interest" in allowing both misleading and defamatory statements being made to the Charging Parties' employees and patrons, pertaining to a labor dispute over which they have no control in order to exact economic harm against them.  There is, however, a significant public interest in the enforcement of federal labor law through the curtailment of the unlawful secondary boycott activates here.  See, e.g., Ahearn, 1992 U.S. Dist.

LEXIS at 18.  In the final analysis, the relief sought by the Board is entirely just and proper and, in fact, equitable in order to protect the integrity of both the Board's proceedings and the Act. See Newspaper & Mail Delivers' Union, 209 F. Supp. at 438 (observing that injunctive relief is intended "not only to protect the public welfare but to preserve the integrity of the procedure before the Board").

## **CONCLUSION**

Based on the foregoing, we respectfully join in the Regional Director's request for the entry of a preliminary injunction against Respondent pursuant to section 10(l) of the Act.

WHITE AND WILLIAMS LLP

Dated: June 23, 2019                    By: */s/ James P. Anelli*_____
                                           James P. Anelli, Esq.

20

# EXHIBIT 1

23010536v.1



# EXHIBIT 2

23010536v.1

## STATEMENT OF ERIK BRAY

1. I currently am a Construction Director for Kimco Realty Corp. ("Kimco").

2. I have worked at the Mannix Family Market's new ShopRite construction site on Hylan Boulevard in Staten Island, New York ("Hylan") since January 2019.

3. In or around late-April 2019, Kimco became aware of union activity at Hylan by the Construction and General Building Laborers Local 79 ("Local 79"). In my role as Kimco's Construction Director, I approached two Local 79 representatives at the site and provided them with my business card. The two Local 79 representatives stated they would forward my business card to their supervisor.

4. Within a couple of days after providing my business card, I received a phone call from Local 79's Business Agent for Staten Island, Pawel (Junior) Gruchacz ("Gruchacz"). Gruchacz advised that he wanted to schedule a call for May 1, 2019 with his team, which included Local 79's President Anthony Vita ("Vita") and a Local 79 Executive Board Member named Chaz Rynkiewicz ("Rynkiewicz"). A call was scheduled.

5. During the May 1 call, the Local 79 representatives (i.e., Gruchacz, Vita and Rynkiewicz) expressed a desire for Local 79 to be selected as a contractor on all of Kimco's projects in the five boroughs of New York City. I explained that this is not how Kimco operated its bidding process and that Local 79 was free to bid on work. We also discussed a future opportunity on a project in Brooklyn or other Kimco projects where Local 79 may be able to provide labor services.

6. In follow-up, I called Gruchacz on May 2 regarding an in-person meeting with Local 79's representatives to discuss the union activity at Hylan and future projects. Gruchacz did not answer my call but sent me a text message stating, "I will call you back tomorrow." 1

3

responded to Gruchacz via text message that I wanted to meet on May 6 at 5:00 p.m. in Manhattan. I did not receive a return call or text from Gruchacz. I sent Gruchacz another text message on May 3 asking that he please speak with me to confirm where he is located – Manhattan or Staten Island. Gruchacz replied to my text message on May 3 stating, "Staten Island." I sent additional text messages to Gruchacz on May 3 and May 6 regarding details of the in-person meeting that I anticipated would take place on May 6. Gruchacz eventually responded on May 6 via text message that he wanted to meet on May 8 with Vita and me. I continued sending text messages to Gruchacz on May 6 to confirm the time and location of the May 8 meeting. Gruchacz replied to my text message on May 6 that he was waiting for Vita to get back to him regarding time and location for the May 8 meeting. I sent another text message to Gruchacz on May 7 to confirm details for the May 8 meeting. Gruchacz never responded to my May 7 text message.

7.     On the afternoon of May 7, Gruchacz called me to advise that per Vita, if Kimco did not award to Local 79 all of its labor work in the five boroughs, or in the alternative sign an agreement to have only union laborers work on its projects, then Local 79 and Kimco had nothing further to discuss and there was no reason to meet in-person. Gruchacz stated if Kimco did not agree to these terms, Local 79 "would go another route."

Erik Bray
Construction Director

06 . 21 . 2019
Date (mm/dd/yyyy)

Sworn to before me this
21ˢᵗ day of June, 2019.

Notary Public

SANDRA C BRODEUR
Notary Public - New Hampshire
My Commission Expires Aug 22, 2023

4

23010536v.1