UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

D/F

-------------------------------------------------------------------X

KATHY DREW KING, Regional Director of
Region 29 of the National Labor Relations Board,
for and on behalf of the NATIONAL LABOR
RELATIONS BOARD,

                         Petitioner,                           **MEMORANDUM & ORDER**

         -against-                                             **19-CV-3496 (NGG) (VMS)**

CONSTRUCTION & GENERAL BUILDING
LABORERS' LOCAL 79, LABORERS
INTERNATIONAL UNION OF NORTH AMERICA,

                         Respondent.
-------------------------------------------------------------------X

NICHOLAS G. GARAUFIS, United States District Judge.

         Petitioner Kathy Drew King, Regional Director of Region 29 of the National Labor

Relations Board ("NLRB"), acting for and on behalf of the NLRB, brings this application for a

preliminary injunction, pursuant to § 10(l) of the National Labor Relations Act (the "NLRA"),

29 U.S.C. § 160(l), prohibiting Respondent Construction & General Building Laborers'

Local 79, Laborers International Union of North America ("Local 79") from engaging in certain

demonstrations in a manner that Petitioner contends constitutes an unfair labor practice under

§ 8(b)(4)(i) and (ii)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(i) and (ii)(B).[1]  (See Pet. for TRO

("Pet.") (Dkt. 1).)  Specifically, the NLRB seeks a broad order enjoining Local 79 from:

---

[1] In relevant part, § 158(b)(4)(i) and (ii)(B) provides as follows:

         § 158. Unfair labor practices

         (b) Unfair labor practices by labor organization

         It shall be an unfair labor practice for a labor organization or its agents—

         . . .

         (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in
         commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of
         his employment to use, manufacture, process, transport, or otherwise handle or work on any

> [I]n any manner or by any means, engaging in any picketing or
> other conduct, including the use of inflatable rats and cockroaches,
> with an object to induce or encourage individuals employed by
> Mannix Family Market @ Hyland Blvd LLC, Mannix Family
> Market @ Forest and Richmond Ave, LLC, and Mannix Family
> Markets @ Veterans Rd LLC, in Staten Island New York and other
> persons engaged in commerce or in industries affecting commerce
> to refuse to handle or perform services, in furtherance of
> Respondent's dispute with Kimco Realty Corp. (Kimco) and GTL
> Construction LLC (GTL); and threatening, restraining, or coercing
> any other person engaged in commerce, or in an industry affecting
> commerce, to cease handling, using, selling, transporting, or
> otherwise dealing in the products of, or to cease doing business
> with Kimco and GTL, or any other person engaged in commerce,
> or in an industry affecting commerce, or with each other.

(Proposed Order Granting Prelim. Inj. (Dkt. 4) at 3.)

For the reasons discussed below, the court DENIES petitioner's motion.

## I.   BACKGROUND

### A.   Factual Background

The following facts, which are undisputed, are drawn from the Petition and its

attachments—the NLRB Complaint and Notice of Hearing, the Amendment to Complaint,

affidavits, and copies of the handbills distributed by Local 79—as well as the briefing of the

parties and their arguments before Judge Frederic Block and this court.

---

goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or
restrain any person engaged in commerce or in an industry affecting commerce, where in either
case an object thereof is—

. . .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise
dealing in the products of any other producer, processor, or manufacturer, or to cease doing
business with any other person, or forcing or requiring any other employer to recognize or bargain
with a labor organization as the representative of his employees unless such labor organization has
been certified as the representative of such employees under the provisions of section 159 of this
title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful,
where not otherwise unlawful, any primary strike or primary picketing[.]

This case arises from the protest activities of Local 79 outside three ShopRite locations in Staten Island, New York.  These three ShopRite supermarkets are owned and operated by Mannix Family Market @ Hylan Blvd LLC ("Mannix Hylan"), Mannix Family Market @ Forest and Richmond Ave. LLC ("Mannix Richmond"), and Mannix Family Market @ Veterans Road LLC ("Mannix Veterans"), respectively.  (See Pet. ¶¶ 8(a), (d), and (g).)  Kevin Mannix ("Mannix"), the majority owner and operator of Mannix Hylan, Mannix Richmond, and Mannix Veterans, entered into a sub-lease agreement with Wakefern Food Corporation to operate an additional ShopRite supermarket at a new shopping center currently under construction at 2600 Hylan Boulevard, Staten Island, New York (the "Boulevard Project").  (Id. ¶ 8(m).)  Wakefern Food Corporation is subject to a lease agreement with Kimco Realty Corporation ("Kimco Realty") to lease that space.  (Id.)  To construct this new shopping center, Kimco Realty has contracted with GTL Construction LLC ("GTL Construction").  (Id.)  Local 79 contends that GTL Construction uses non-union construction labor and pays employees below area-standard wages and benefits.  (Mem. in Supp. of Pet. ("Mem.") (Dkt. 6) at 3.)

In connection with their labor dispute, starting in late April 2019, Local 79 engaged in a series of demonstrations outside of the stores owned by Mannix Hylan, Mannix Richmond, and Mannix Veterans (the "Mannix Stores").

In late fall or early December 2018, Thomas Mannix, a Mannix employee, saw a large van parked across the street from the Richmond Store that was displaying a digital screen that read: "SHOP RITE MANNIX SUPERMARKETS" and "TELL KEVIN MANNIX TO MAKE THE RIGHT CHOICE AND PAY AREA STANDARD WAGES AND BENEFITS TO THE CARPENTERS WORKING AT THE NEW SHOP RITE STORE AT THE BOULEVARD MALL."  (May 13, 2019 Aff. of Thomas Mannix ("May 13 Mannix Affidavit") (Dkt. 1, Ex. 4) at

3

5.)  Thomas Mannix asked the police to make sure that the van was parked legally, but took no

further action.  (Id.)  Also in December 2018, Thomas Mannix saw two men walking up New

Dorp Lane almost a mile from the Hylan Store passing out flyers.  (Id.)  The flyer had a crossed-

out ShopRite logo at the top and the same message as had been displayed on the van.  (Id.)

Around the same time, another Mannix employee, Michael Koch, saw a man standing on

the sidewalk outside the Richmond Store handing out flyers that were titled "SHOP RITE

MANNIX SUPERMARKETS" and encouraged people to tell Kevin Mannix to pay area

standard wages and benefits to carpenters working at a construction site for a new Mannix store.

(Aff. of Michael Koch ("Koch Aff.") at 1-2.)  He also saw the van with the digital sign parked

across the street from the Richmond Store.  (Id.)  He contacted his own representative at the

United Food and Commercial Workers, Local 1500.  (Id.)  Two days later, he received a call

from a representative of Carpenters Local 20, who explained the concerns related to the

construction site.  (Id. at 3.)  Koch told this individual that Mannix has no control over hiring at

the construction site, but agreed to pass along his information to his contact at the construction

site developer, which he did.  (Id.)  The van with the sign was observed in the same spot across

the street from the Richmond Store several times each week between December 2018 and mid-

February 2019.  (Id.)  On May 3, 2019, Koch was informed that the van had returned to the

Richmond Store location and was displaying "different images on a rotating basis," but the

images did not identify which union was responsible for them.  (Id. at 4.)

On April 29, 2019, Local 79 set up one inflatable rat outside the Hylan Store.  (May 13

Mannix Aff. at 2.)  Three men were observed standing next to the rat, which was placed

approximately 70 yards from the doorway entrance of the store and about 15 feet from the traffic

intersection leading into the store's parking lot.  (Id.)  The rat had a flyer attached to its stomach

4

that said "Shame on you Kevin Mannix!!" and contained a message about how Mannix was allowing Kimco Realty and GTL Construction to build its new supermarket using "exploited construction workers." (Id.) At one point Thomas Mannix approached the three men. (Id.) The workers told him that they were protesting the fact that there was a construction site down the street that was building a new store for Mannix using non-union labor. (Id.) Thomas Mannix asked the men to move their two cars from the Mannix parking lot, but they refused. (Id. at 3.) Thomas Mannix then called the police, who arrived and had a short conversation with the men, after which the men removed their cars from the parking lot. (Id.) The men remained on the sidewalk with the rat until about 2:00 p.m. (Id.)

Koch states that he also observed two men on the sidewalk outside Hylan Store on or around this date. (Koch Aff at 4.) They were approximately 50 or 60 yards from the entrance to the supermarket and a short distance from the entrance to its parking lot. (Id.) They were wearing sweatshirts that said "Local 79" and were sitting next to a large inflated rat with a flyer taped to its stomach. (Id.)

Another Mannix employee, Ronny Thomas, also observed this demonstration outside the Hylan Store on April 29 and states that the union had inflated three rats. (Aff. of Ronny Thomas ("Thomas Aff.") (Dkt. 1, Ex. 8) at 3.) He spoke to the men from Local 79, who informed him that they were protesting outside Mannix stores because, as the largest tenant at the new shopping center, Mannix had influence over Kimco Realty, who was currently employing non-union labor at the construction site. (Id. at 2-3.) Thomas told the men not to block the sidewalk or store front, and they did not. (Id.) The police informed Thomas that they had told Local 79 that three inflatable rats was "excessive," although they were within their rights to demonstrate in that location. (Id. at 4.) The men from Local 79 deflated one of the three rats. (Id.) The men

stood more or less in the same spot all day and did not handbill, distribute flyers, chant, or initiate conversations with any passersby. (Id. at 3.) They handed flyers to individuals who stopped and spoke to them. (Id. at 4.)

The same day, another Mannix employee, James Nappo, also had a conversation with the men from Local 79. (Id.; Aff. of James Nappo ("Nappo Aff.") (Dkt. 1, Ex. 7) at 2-3.) Nappo states that one of the men standing by the rat told him that Mannix did not intend to use union workers at the new store once it opened. (Nappo Aff. at 2; May 13 Mannix Aff. at 3-4.) Nappo "forcefully contradicted" the man by explaining that Mannix intended to continue hiring union employees at the new location. (Nappo Aff. at 3.) Another Local 79 representative then stepped forward and corrected what the first man had said. (Id. at 3.) He clarified that Mannix was not trying to go non-union at the new location. (Id. at 3; May 13 Mannix Aff. at 3.) Nappo relayed this conversation to Thomas Mannix, explaining that he "couldn't believe what the men had just said to him," and that he knew what the man had said (about hiring non-union labor once the new store opened) was untrue. (May 13 Mannix Aff. at 4.)

Since April 29, Thomas Mannix and other employees have seen men positioned with at least one inflated rat on the sidewalk in front of the Hylan Store during most weekdays. (Id.; Nappo Aff. at 4; Thomas Aff. at 4.) Thomas Mannix states that he does not believe the men brought the rat to that location on the weekends. (May 13 Mannix Aff. at 3.) Nappo and Koch state that they have also seen these men from Local 79 with one to three inflated rats near this same spot each week from about 6:15 a.m. to 2:00 p.m. (Nappo Aff. at 4; Koch Aff. at 5; Thomas Aff. at 4.) These men do not make announcements or verbal statements or hand flyers to people who pass by; instead, they sit or stand quietly near the rat. (Nappo Aff. at 4.) Nappo stated that he has only seen them give flyers to individuals who stop and speak to them. (Id.)

On May 15, 2019, Thomas Mannix arrived at the Hylan Store around 8:00 a.m. and saw four men standing on the public sidewalk directly in front of the entrance to the parking lot next to a large inflated rat. (May 15, 2019 Aff. of Thomas Mannix ("May 15 Mannix Aff.") (Dkt. 1, Ex. 5) at 1-2.) The rat was about 10 feet tall. (Id. at 2.) The men were not making any noise and were standing relatively still. (Id. at 2.) At around 12:00 p.m., Thomas Mannix received a call from another Mannix employee, who stated that the demonstration had grown in size. (Id.) On his way outside to observe the demonstration, Thomas Mannix noticed that he could hear noises from the demonstration, including chanting and shouting into a bullhorn, while he was still inside. (Id.) He then observed about 20 to 25 people gathered near the inflated rat. (Id.) They had also inflated a large cockroach. (Id.) This group took up the entire portion of the sidewalk leading into that portion of the store's parking lot, but Thomas Mannix noted that he did not see any pedestrian walking up the street during the demonstration. (Id.) The participants in the protest stood in a single place and did not pace back and forth. (Id.) Many of them were wearing personal protection equipment commonly worn on construction sites. (Id.) Two demonstrators with bullhorns led the rest of the group in chants, and some members blew whistles. (Id.) The demonstrators chanted "Union Labor"; "What do we want?!" "Union jobs!" "When do we want it?!" "Now!"; "We beat 9 injunctions before!"; "If we don't get it?" "Shut it down!"; and "Stand up! Fight back!" (Id. at 3.) This demonstration lasted from 12:00 p.m. to 1:00 p.m., at which point the entire group packed up its belongings and the inflated rat and cockroach and left. (Id. at 3-4.) The area was clear by 1:15 p.m. (Id. at 4.)

On May 20, 2019, an employee at the store owned by Mannix Veterans (the "Veterans Store") observed a union representative set up a large inflatable rat on a public walkway approximately 15 yards from the entrance to the store's parking lot and 150 yards from the

store's entrance. (Aff. of Tony Martori ("Martori Aff.") (Dkt. 1, Ex. 9) ¶¶ 3-4.) An hour later, two additional representatives joined the first union representative. (Id. ¶ 5.) Another employee of Mannix Veterans spoke with these men, who told him that their demonstration was related to the construction of a new shopping center. (Id. ¶ 5; Aff. of Lou Romagnano ("Romagnano Aff.") (Dkt. 1, Ex. 10) ¶ 5.) As he walked away, he was given a handbill that said "Shame on You Kevin Mannix!!" with additional writing below that. (Martori Aff. ¶ 6; Romagnano Aff. ¶ 6.) The three men were standing or sitting in their vehicle throughout the morning. (Martori Aff. ¶ 7.) They were not making loud noises or chanting and did not display any signage or electronic billboards. (Id.) They left by 1:15 p.m. (Id. ¶ 8.) On May 21, 2019, this employee again observed three union representatives sitting or standing next to a rat for the duration of the morning. (Id. ¶¶ 9-11.) At one point, these individuals spoke with a store customer about their demonstration, but at no point did they chant or make loud noises. (Id. ¶¶ 12-13.) They and the rat were gone by about 1:15 p.m. (Id. ¶ 14.)

Copies of handbills handed out by Local 79, which were attached to the Petition (Dkt. 1) as Exhibit 11, and images of the rats outside the supermarkets, which were attached to Local 79's opposition (Dkt. 18) as Exhibit A, are reproduced here:

# Shame on You
# Kevin Mannix!!

Kevin Mannix Owner and Operator of 3 ShopRite
grocery stores on Staten Island is allowing GTL
Construction to exploit construction workers at
2600 Hyland Boulevard!

Would you not agree that a less trained and less skilled
construction workforce can lead to an unsafe workplace,
shoddy workmanship and will produce a lower quality
finished product?

While New York City construction workers build our city, help
show your support for their desire to work in a safe environment
and be treated with the *dignity* and *respect* they deserve.

We demand living wages for construction workers!!

Call Kevin Mannix @ (718) 979-3303
and tell him that all workers deserve a living wage.

9

# Shame on You
# Kevin Mannix!!

Kevin Mannix – Owner and Operator of 3 ShopRite grocery stores on Staten Island – is standing by while Kimco Realty Corp has GTL Construction build his new ShopRite (at 2600 Hyland Boulevard) *using exploited construction workers!*

Would you not agree that a less trained and less skilled construction workforce can lead to an unsafe workplace, shoddy workmanship and will produce a lower quality finished product?

While New York City construction workers build our city, help show your support for their desire to work in a safe environment and be treated with the *dignity* and *respect* they deserve.

We demand living wages for construction workers!!

Call **Kevin Mannix** @ (718) 979-3303 and tell him that all workers deserve a living wage.

This leaflet, produced by Local 79, is directed at the public and is not an inducement for anyone to stop working or making deliveries



# Shame on You Kevin Mannix!!

Kevin Mannix – Owner and Operator of 3 ShopRite grocery stores on Staten Island – is standing by while Kimco Realty Corp has GTL Construction build his new ShopRite (at 2600 Hyland Boulevard) *using exploited construction workers!*

Would you not agree that a less trained and less skilled construction workforce can lead to an unsafe workplace, shoddy workmanship and will produce a lower quality finished product?

While New York City construction workers build our city, help show your support for their desire to work in a safe environment and be treated with the *dignity* and *respect* they deserve.

We demand living wages for construction workers!!

Call **Kevin Mannix** @ (718) 979-3303 and tell him that all workers deserve a living wage.









**B.      Procedural History**

On May 9, 2019, Mannix Hylan and Mannix Richmond (the "Charging Parties") filed a

charge with the NLRB alleging that Respondent Local 79 violated § 8(b)(4)(i) and (ii)(B) of the

NLRA.  (Pet. ¶ 3.)  After a "field investigation," during which the parties had opportunities to

submit evidence, the NLRB determined that Local 79 was "engaging in unfair labor practices in

violation of § 8(b)(4)(i) and (ii)(B) of the NLRA."  (Id. ¶ 5.)

On May 17, 2019, Kevin Mannix and the Charging Parties also filed a complaint under

§ 303 of the Labor Management Relations Act of 1947, as amended ("LMRA"), 29 U.S.C.

§ 187, and § 8(b)(4) of the NLRA, 29 U.S.C. § 158(b)(4), against Local 79 and three other

unions, seeking damages for injuries allegedly suffered as a result of those unions' unlawful

secondary boycotting activities at the Hyland and Richmond Stores, as well as their use of

knowingly false and/or misleading electronic billboard vehicles and handbills to engage in

unlawful secondary boycotting at various other locations within Staten Island.  (See Mannix

Compl. (Dkt. 1 in Mannix Family Market @ Hylan Blvd LLC et al. v. Local 79, Construction

and General Building Laborers et al., No. 19-CV-2929 (NGG) (VMS) (E.D.N.Y.)).)

On June 6, 2019, after completing the aforementioned investigation, the NLRB issued a

Complaint and Notice of Hearing.  (Pet. ¶ 6.)  The complaint was amended on June 11, 2019.

(Id.)  A hearing on the allegations of the NLRB complaint, as amended, is scheduled to be held

before an Administrative Law Judge ("ALJ") of the NLRB on July 24, 2019.  (Id.)

On June 13, 2019, the NLRB initiated the instant action before this court, moving for a

temporary restraining order ("TRO") and preliminary injunction.  (See Pet.; Unsigned Order to

Show Cause (Dkt. 2); Proposed Order Granting TRO (Dkt. 3); Proposed Order Granting Prelim.

Inj.)  The injunction sought is remarkably broad; it asks the court to enjoin and restrain Local 79 from:

> [I]n any manner or by any means, engaging in any picketing or other conduct, including the use of inflatable rats and cockroaches, with an object to induce or encourage individuals employed by Mannix Family Market @ Hyland Blvd LLC, Mannix Family Market @ Forest and Richmond Ave, LLC, and Mannix Family Markets @ Veterans Rd LLC, in Staten Island New York and other persons engaged in commerce or in industries affecting commerce to refuse to handle or perform services, in furtherance of Respondent's dispute with Kimco Realty Corp. (Kimco) and GTL Construction LLC (GTL); and threatening, restraining, or coercing any other person engaged in commerce, or in an industry affecting commerce, to cease handling, using, selling, transporting, or otherwise dealing in the products of, or to cease doing business with Kimco and GTL, or any other person engaged in commerce, or in an industry affecting commerce, or with each other.

(Proposed Order Granting Prelim. Inj. at 3.)

On June 14, 2019, Local 79 filed a memorandum in opposition to the motion for a preliminary injunction.  (See Mem. in Opp'n to the Request for Injunctive Relief (Dkt. 12).) Later that same day, Judge Block issued an order to show cause ("OTSC") why a TRO should not be granted.  (OTSC (Dkt. 13).)  He ordered the parties to appear for a hearing before him on June 19, 2019, and directed Local 79 to submit a written response to the order before that hearing.  (Id. at 1-2.)  He also noted that "[a]ny request for preliminary injunctive relief should be directed to the assigned judge."  (Id. at 2.)  On June 18, 2019, Local 79 filed a memorandum in opposition to the request for a TRO, which restated and expanded upon the arguments advanced in its memorandum in opposition to the motion for a preliminary injunction.  (See Mem. in Opp'n to TRO ("Opp'n") (Dkt. 18) at 1 n.1.)

The parties appeared before Judge Block on June 19, 2019.  (See June 19, 2019 Min. Entry.)  After oral argument, Judge Block denied their TRO.  (See id.)  Judge Block expressed doubt about whether the NLRB would be successful on the merits, given existing caselaw

concerning the use of rats by labor unions, and stated that the NLRB had failed to demonstrate irreparable harm.  (See Tr. of June 19, 2019 Hr'g ("June 19 Hr'g Tr.") (undocketed) at 27:14-25.)

This court held oral argument on the request for a preliminary injunction on June 24, 2019.  (See June 24, 2019 Min. Entry.)  The court ordered Petitioner to inform the court whether it believed an evidentiary hearing was necessary (see id.), and on June 25, 2019, Petitioner stated that it did not believe that a hearing was necessary (see Pet'r June 25, 2019 Letter (Dkt. 22)).

## II.    LEGAL STANDARD

In considering a petition for injunctive relief under § 10(l) of the NLRA, a district court's task "is two-fold: it must determine whether there is reasonable cause to believe that the [NLRA] has been violated, and, if so, whether the requested relief is 'just and proper.'"  Silverman v. 40-41 Realty Assocs., Inc., 668 F.2d 678, 680 (2d Cir. 1982) (quoting Kaynard v. Palby Lingerie, Inc., 625 F.2d 1047, 1051 (2d Cir. 1980)).[2]

The Second Circuit has made clear that injunctive relief is not "just and proper" where the legal theory advanced by the Regional Director involves an "unprecedented application of the [NLRA]," or where the issue in a given case is "a difficult one that had not been considered by any court."  Id. (vacating a temporary injunction permitting interior picketing within an office building—a novel application of law governing picketing on a sidewalk—while the NLRB considered the lawfulness of such conduct).  The court explained that while "sound administration of the [NLRA] requires appropriate deference to the expertise of the Board, and

---

[2] Although Realty Associates concerned an application for injunction relief under § 10(j) of the NLRA, and the NLRB moves here under § 10(l), the standard is the same under either section.  See Seeler v. Trading Port, Inc., 517 F.2d 33, 37 (2d Cir. 1975) (noting that the Second Circuit "has held that in deciding whether to grant injunctive relief, the district court should apply the same standards in §10(l) cases as it does in § 10(j) cases" (citing Danielson v. Joint Bd. of Coat, Suit, & Allied Garment Workers Union, 494 F.2d 1230, 1242 (2d Cir. 1974).)

some degree of deference is warranted when the Regional Director seeks an injunction under

sections 10(j) and 10(l) pending a Board decision," such deference is not warranted when "the

court is asked to make the initial ruling as to the propriety of a novel and unprecedented

application of the statute, [after which] the Board will apply its expertise to the issues presented,"

Realty Assocs., 668 F.2d at 681 (2d Cir. 1982) (internal citations and quotation marks omitted)

or where "the district court is convinced that the General Counsel's legal position is wrong,"

Danielson, 494 F. 2d at 1241.

Courts should also keep in mind that the ability of a court to issue injunctions under

§ 10(1) of the NLRA "in no way change[s] the extraordinary nature of the injunctive remedy,"

and that "general equitable principles apply in deciding the propriety of a temporary injunction

issued" pursuant to the NLRA. Realty Assoc., 668 F.2d at 680 (citations omitted). "These

considerations have special force in a case . . . involving an unprecedented application of the

[NLRA]." Id.

## III.   ANALYSIS

As a threshold matter, the court notes that Local 79's "peaceful use of stationary,

inflatable rats and a cockroach to publicize a labor protest is protected by the First Amendment."

See Microtech Contracting Corp. v. Mason Tenders Dist. Council of Greater New York, 55 F.

Supp. 3d 381, 389 (E.D.N.Y. 2014) (holding that "no strike" provision in a collective bargaining

agreement did not prohibit the use of an inflatable rat under the circumstances); see also Tucker

v. City of Fairfield, 398 F.3d 457, 462 (6th Cir. 2005) ("In our view, there is no question that the

use of a rat balloon to publicize a labor protest is constitutionally protected expression within the

parameters of the First Amendment."); Int'l Union of Operating Engineers, Local 150 v. Vill. of

Orland Park, 139 F.Supp.2d 950, 958 (N.D. Ill. 2001) ("We easily conclude that a large

inflatable rat is protected, symbolic speech."); W2005 Wyn Hotels v. Asbestos, Lead &

Hazardous Waste Laborers' Local 78, No. 11-CV-1249 (DAB), 2012 WL 955504, at *3

(S.D.N.Y. Mar. 8, 2012) (noting that the use of an inflatable rat in labor disputes is sometimes,

but not always, protected by the First Amendment); Sheet Metal Workers Int'l Ass'n, Local 15

("Brandon II"), 356 NLRB 1290, 1293 (2011) ("[A] rat balloon . . . must be viewed as an

'expressive activity' protected by the First Amendment."). The court thus asks whether, under

the particular circumstances of this case, the Regional Director had reasonable cause to believe

that the rats and cockroach used by Local 79 violated § 8(b)(4)(i) and (ii)(B) of the NLRA. The

court then considers whether the remedy of a preliminary injunction would be "just and proper."

### A.    Reasonable Cause

The first question under the first prong of the § 10(l) test is whether reasonable cause

exists to believe that Local 79 has violated the NLRA. See Realty Assocs., 668 F.2d at 680. In

assessing reasonable cause, the district court should "examin[e] the facts of the case with

reference to the law as it had been developed by the Board and its reviewing courts." McLeod

for & on Behalf of N.L.R.B. v. Nat'l Mar. Union of Am., AFL-CIO, 457 F.2d 490, 494 (2d Cir.

1972).

Petitioner contends that there is reasonable cause to believe that Local 79 has violated

§ 8(b)(4)(i) and (ii)(B) through its demonstrations outside the Mannix Stores because "[t]he

object of [Local 79's] actions is to coerce employees of the Mannix stores to cease working for

Mannix and to persuade customers and others engaged in commerce to cease doing business with

Mannix, thus apply[ing] pressure on Mannix to break its lease with Wakefern and by extension

cease doing business with Kimco and GLT to advance Respondent's labor dispute with GTL."

(Mem. at 9.) The court reviews each subsection in turn.

20

1.  Section 8(b)(4)(i)(B)

In relevant part, § 8(b)(4)(i)(B) states:

> It shall be an unfair labor practice for a labor organization or its agents . . . to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services . . . , where . . . an object thereof is . . . forcing or requiring any person to cease . . . doing business with any other person."

29 U.S.C. § 158(b)(4)(i)(B).  A union therefore violates § 8(b)(4)(i)(B) "by picketing or other activity that induces or encourages the employees of a secondary employer to stop work, where an object is to compel that employer to cease doing business with the struck or primary employer."  Sw. Reg'l Council of Carpenters, 356 NLRB 613, 615 (2011); see BD Dev., LLC v. Local 79, Laborers Int'l Union of N. Am., No. 14-CV-4876 (JS), 2018 WL 1385891, at *23 (E.D.N.Y. Mar. 19, 2018) ("A union violates § 8(b)(4)(i) when it induces or encourages the employees of a secondary employer to strike against or to refuse to handle goods for an employer [for an unlawful purpose]." (citing Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg., 485 U.S. 568, 584 (1988); Capitol Awning Co., Inc. v. Local 137 Sheet Metal Workers Int'l Ass'n, 698 F. Supp. 2d 308, 327 (E.D.N.Y. 2010))).  "Unless both of those elements are demonstrated, no violation of the [NLRA] may be found."  Sw. Reg'l Council of Carpenters, 356 NLRB at 615; see Carrier Air Conditioning Co. v. N.L.R.B., 547 F.2d 1178, 1190 (2d Cir. 1976) (dismissing plaintiff's § 8(b)(4)(i)(B) claim as there was no evidence of inducement to strike or to refuse performance); BD Dev., 2018 WL 1385891, at *23 ("[C]laims filed under § 8(b)(4)(i) are limited to instances in which a union targets the employees of a secondary employer and encourages those employees to strike or to refuse to perform their duties for that secondary employer." (citations omitted)); Capitol Awning, 698 F. Supp. 2d at 327 (granting summary judgment in

21

union's favor where there was no evidence that union representatives contacted secondary employees to encourage or induce those employees to strike or to refuse to perform their duties for their respective employers). In contrast, "[a]ctivity intended only to educate consumers, secondary employers, or secondary employees, and even prompt them to action—so long as the action is not a cessation of work by the secondary employees—is lawful." Sw. Reg'l Council of Carpenters, 356 NLRB at 615.

For the reasons discussed below, there was no reasonable cause to believe that the protest activities of Local 79 violated § 8(b)(4)(i)(B) of the NLRA.

First, there is no evidence that Mannix employees ever refused to perform services for reasons related to the protest activity by Local 79. As the Second Circuit has explained, "[w]hile such evidence [that any workers had refused to perform services for reasons related to a secondary protest] is not required to establish a violation of § 8(b)(4)(i)(B), since it is the inducement or encouragement itself that is proscribed, evidence of this sort would certainly have made it easier to infer that a violation had occurred." Carrier Air Conditioning, 547 F.2d at 1190 (citing N.L.R.B. v. Associated Musicians Local 802, 226 F.2d 900, 904-05 (2d Cir. 1955)); see also Sw. Reg'l Council of Carpenters, 356 NLRB at 616 (observing, where there was no evidence of any work stoppage in connection with a banner display, that "[t]he signal the General Counsel alleges is being sent by the banners does not appear to have been understood as such by any secondary employees").

Of greater importance, there is no evidence that Local 79 representatives in any way induced or encouraged employees to refuse to perform services for Mannix or the Mannix-owned stores, let alone that such inducement or encouragement was coercive. In its brief,

Petitioner does not cite a single instance of purported inducement or encouragement directed at Mannix employees; instead, Petitioner merely paraphrases the statute, asserting:

> Respondent's goal is also to induce and encourage the employees of the Mannix-owned stores and other third-party employees to engage in a strike or to refuse in the course of their employment to use, transport, or otherwise handle or work on certain goods, articles, materials, or commodities of Mannix-owned stores or refuse to perform services for Mannix-owned stores.

(Mem. at 3.)  At oral argument, Petitioner's counsel asserted that the rally on May 15, 2019 constituted "textbook" picketing in the determination of the Regional Director.  (Tr. of June 24, 2019 Oral Argument before Judge Garaufis ("Garaufis Tr.")  at 7:12.)  Counsel for Petitioner also pointed to the April 29, 2019 comment made by a Local 79 representative to one Mannix employee that the new Mannix supermarket would be non-union.  (See Tr. of June 19, 2019 Oral Argument before Judge Block ("Block Tr.") at 15:22-16:5; Garaufis Tr. at 13:23-14:13.)  This comment was immediately corrected by another union member (see Nappo Aff. at 2-3), but Petitioner contends that the comment "reveal[ed] the motivation" of the inflated rat (Garaufis Tr. at 24:25).  Petitioner argues that:

> [T]hese types of inflatables are specific signals to the public, to those employees, that this employer is engaged in an unfair labor practice or has a dispute with and that is a signal to union members not to go in and so the union has used rats as a symbol to the public rather than require all of their employees to come and handbill.

(Garaufis Tr. at 26:16-21; see also id. at 14:9-13, 24:23-25:2.)  Petitioner thus appears to argue not only that Local 79 engaged in picketing on May 15, 2019, but also that the inflatables used by Local 79 constitute "signal picketing," a variant of picketing defined as "activity short of picketing through which a union intentionally, if implicitly, directs members not to work at the targeted premises."  Carpenters Local 1506 (Eliason & Knuth of Arizona, Inc.) ("Eliason"), 355 NLRB 797, 805 (2010).

However, the record contains no evidence indicating that the inflatable rat and cockroach were a "prearranged or generally understood signal" meant to induce or encourage the Mannix employees to cease work. See Sw. Reg'l Council of Carpenters, 356 NLRB at 616 (reaffirming that, to prove a violation of § 8(b)(4)(i)(B), "the evidence must prove that the alleged conduct would reasonably be understood by the employees as a signal or request to engage in a work stoppage against their own employer" (citations and quotation marks omitted)).

The rally on May 15, 2019 was far from "textbook" picketing, which "generally involves persons carrying picket signs and patrolling back and forth before an entrance to a business or worksite." Eliason, 355 N.L.R.B. at 802. Indeed, "'[o]ne of the necessary conditions of 'picketing' is a confrontation in some form between union members and employees, customers, or suppliers who are trying to enter the employer's premises.'" Chicago Typographical Union No. 16 (Alden Press, Inc.), 151 NLRB 1666, 1669 (1965) (quoting NLRB v. Furniture Workers, 337 F.2d 936, 940 (2d Cir. 1964)); see also Sheet Metal Workers' Local 15 v. NLRB, 491 F.3d 429, 438 (D.C. Cir. 2007) (holding that a "mock funeral" procession outside a hospital did not constitute picketing, because the participants did not "physically or verbally interfere with or confront Hospital patrons" or create a "symbolic barrier to those who would enter the Hospital"). Here, there is simply no evidence that the May 15, 2019 rally involved confrontation or attempts to block entrance or exit. Instead, union members gathered during one lunch hour and expressed themselves. They stood in a single location on public property, and did not walk back and forth or block the entrance to the ShopRite or its parking lot. Cars entered and left freely. (Opp'n at 21.) The group of 20-25 individuals chanted standard protest chants that can be heard at peaceful union and non-union protests across the country. This rally took place at midday, which, the union contends, is not the time when employees arrive or leave. (Opp'n at 21.) After

approximately an hour, the entire group left, and there have been no additional rallies.  On all

other occasions, the rats and cockroach have been accompanied by two or three union

representatives, who stand or sit quietly near the inflatables.  The circumstances of this rally

cannot give rise to a reasonable conclusion that Local 79 has engaged in "picketing" directed at

employees of Mannix that would violate § 8(b)(4)(i)(B).

The court also finds that one comment made by one union member in April to the effect

that the new store would hire non-union workers, which was immediately corrected by a second

union member, does not constitute an inducement or an encouragement to stop work, nor does it

render the rat and cockroach picketing or signal picketing that is intended to induce or encourage

a work stoppage or refusal to handle goods or perform services.  Notably, Petitioner has put forth

no evidence that any similar misrepresentations or mistakes were repeated at any time before or

after that single corrected comment on April 29, 2019.

Moreover, the signs and leaflets created by Local 79 did not call for or declare a strike or

any other form of job action, but instead explained the nature of the labor dispute and asked

readers to express their support for the union's position.  Specifically, the sign on the van seen

between December 2018 and February 2019 read: "TELL KEVIN MANNIX TO MAKE THE

RIGHT CHOICE AND PAY AREA STANDARD WAGES AND BENEFITS TO THE

CARPENTERS WORKNG AT THE NEW SHOP RITE STORE AT THE BOULEVARD

MALL."  The handbills stated: "Kevin Mannix—Owner and Operator of 3 ShopRite grocery

stores on Staten Island—is standing by while Kimco Realty Corp has GTL Construction build

his new ShopRite (at 2600 Hyland Boulavard) using exploited construction workers!" and asked

the reader to call Kevin Mannix and "tell him that all workers deserve a living wage."  (See

Flyers (Dkt. 1, Ex. 11).)  In addition, at least one version of the handbills distributed by Local 79,

copies of which were attached to the Petition, expressly stated: "This leaflet, produced by Local 79, is directed at the public and is not an inducement for anyone to stop working or making deliveries." (See id. at ECF p. 70.) See Eliason, 355 NLRB at 805 (noting that the handbills distributed by the union expressly stated that they were not urging anyone to refuse to work or deliver goods); Sw. Reg'l Council of Carpenters, 356 NLRB at 615 (same).

Finally, the employees of Mannix working in the ShopRite are not represented by Local 79, so the court is not concerned that the inflatables and handbills were sending a secretive message to which the Mannix employees would be particularly attuned as a consequence of their membership in the demonstrating union. Cf. Sw. Reg'l Council of Carpenters, 356 NLRB at 616 (finding no evidence of signal picketing despite the fact that the secondary employees "were represented by one of the Unions displaying the banners," meaning that "those employees arguably would have been more attuned to a signal to stop work—if one had been given"). On the contrary, the fact that Mannix's employees are themselves unionized (in a different union) makes it even less likely that they would be "concerned . . . that they're crossing a picket line by going to work every day" (see Garaufis Tr. at 12:15-17), as Petitioner contends they are. The court cannot believe that workers—particularly unionized workers—do not know the difference between a picket line and an inflated rat. Indeed, as discussed above, there is no evidence that the Local 79 demonstration has had any negative effect on labor relations between Mannix and his unionized employees.

It is true, of course, that Mannix employees might have seen the rat and cockroach and felt concern that Mannix was "engaging in some sort of unfair labor practice" (Garaufis Tr. at 12:14), but a message about a secondary employer does not violate § 8(b)(4)(i)(B) just because it might reach the eyes and ears of secondary employees and might cause them to think bad things

about their employer. "To hold otherwise would be to prohibit the union from engaging in any speech that is harmful to plaintiff's [] image," a holding that would "completely eviscerate the First Amendment rights of the union." See Microtech Contracting Corp, 55 F. Supp. 3d at 384. Instead, § 8(b)(4)(i)(B) requires that union actually "induce or encourage" secondary employees to cease work. See Sw. Reg'l Council of Carpenters, 356 NLRB at 617 n.18 (noting that an "expansive view of the terms 'induce or encourage' in § 8(b)(4)(i) to cover almost any expression concerning a labor dispute made in the vicinity of secondary employees . . . necessitates the application of the constitutional avoidance doctrine"); Overstreet v. United Bhd. of Carpenters & Joiners of Am., Local Union No. 1506, 409 F.3d 1199, 1215 (9th Cir. 2005) ("To broaden the definition of 'signal picketing' to include 'signals' to any passerby would turn the specialized concept of 'signal picketing' into a category synonymous with any communication requesting support in a labor dispute."). On the contrary, "[a]ctivity intended only to educate consumers, secondary employers, or secondary employees, and even prompt them to action—so long as the action is not a cessation of work by the secondary employees—is lawful." Sw. Reg'l Council of Carpenters, 356 NLRB at 615.

Because there is a complete "absence of evidence that the [u]nion did anything other than seek to communicate the existence of its labor dispute to members of the general public," see Sw. Reg'l Council of Carpenters, 356 NLRB at 616 (quoting Eliason, 355 NLRB at 805), the court cannot conclude that the Regional Director had reasonable cause to believe that Local 79's activities violated § 8(b)(4)(i).

    2.    Section 8(b)(4)(ii)(B)

Section 8(b)(4)(ii)(B) states:

> It shall be an unfair labor practice for a labor organization or its agents . . . to threaten, coerce, or restrain any person engaged in

> commerce or in an industry affecting commerce, where . . . an
> object thereof is forcing or requiring any person to cease using,
> selling, handling, transporting, or otherwise dealing in the products
> of any other producer, processor, or manufacturer, or to cease
> doing business with any other person.

29 U.S.C. § 158(b)(4)(i)(B).

A labor union thus engages in unfair labor practices "with respect to a secondary employer in violation of § 8(b)(4)(ii)(B) when it (i) threatens, coerces or restrains a neutral party, (ii) with the object of coercing that party to cease doing business with the plaintiff, and (iii) there is a causal connection between the violation and the harm plaintiff suffered." Capitol Awning Co., 698 F. Supp. 2d at 322 (citing Del Turco v. Speedwell Design, 623 F.Supp.2d 319, 348 (E.D.N.Y.2009)). The Supreme Court has emphasized that "[m]ore than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii)(B): that section requires a showing of threats, coercion, or restraints." DeBartolo, 485 U.S. at 578. Further, "[t]hose words . . . are 'nonspecific, indeed vague,' and should be interpreted with 'caution' and not given a 'broad sweep'" to avoid conflict with the First Amendment. Id. (quoting Drivers, 362 U.S. at 290). The NLRB has recognized that "peaceful expressive activity at a purely secondary site can violate Section 8(b)(4)(ii)(B) if the activity is deemed to be picketing" that demonstrates the "essential element of confrontation." Brandon II, 356 NLRB at 1291 (alterations adopted) (citation and quotation marks omitted) (finding that a union did not violate § 8(b)(4)(ii)(B) by displaying a large inflatable rat on public property at a secondary site and holding that the rat and leaflet display were similar to other expressive activity protected by the First Amendment).

Here, Petitioner contends that Local 79 has engaged in "coercive conduct" in the form of "setting up a rat, handbilling, picketing the Mannix-owned stores, and distributing flyers that are ambiguous, misleading, and inaccurate in an effort to confuse the public about the nature of Respondent's dispute by creating the impression that Mannix has control over GTL's

employment practices." (See Mem. at 11.) Petitioner's central concern, however, is the inflatables: "The form of [Local 79's] economic coercion is the use of inflatable rats and an inflatable cockroach that are erected daily at or near the premises of Mannix-owned stores." (Id. at 3.)

Based on the circumstances of this case, which are set forth in detail above, the court finds that the activities of Local 79 outside the Mannix stores—a regular display of inflatable rats and a cockroach on a public street, peaceful and limited handbilling, and a single, peaceful, stationary, hourlong rally in mid-May—do not constitute picketing, lack the "essential element of coercion," see id., and do not otherwise rise to the level of "threats, coercion, or restraints" necessary to find a violation of § 8(b)(4)(ii)(B), see DeBartolo, 485 U.S. at 578. As in DeBartolo, there is "no suggestion that the leaflets [or rat] had any coercive effect on customers" and "[t]here was no violence, picketing, or patrolling and only an attempt to persuade" the public to ask Kevin Mannix not to "stand by" while Kimco Realty and GTL Construction "exploit[]" construction workers." (See Flyers.) To the extent that the inflatables and the handbills have caused a loss of revenue—no evidence of which is in the record—it is therefore "not because [customers] are intimidated by a line of picketers," but instead is "the result of mere persuasion." See DeBartolo. "[T]he neutral who reacts is doing no more than what its customers honestly want it to do." See id.

The court also cannot find, as Petitioner apparently wishes it to do, that the union's peaceful, nonthreatening, noncoercive, expressive activity is "coercion" within the meaning of § 8(b)(4)(ii)(B) because the target of their expressive conduct feels that the rat and the text of the handbills create "ambigu[ity]" or unfairly overstate the degree to which he believes he can influence the labor practices of the contractor building his new grocery store. The notion that a

violation of § 8(b)(4)(ii)(B) could be found—and a federal court could enjoin expressive conduct—wherever the target of a protest disagreed with the content of the message (or, indeed, the way it is written) is untenable, and would raise serious constitutional concerns.

The court thus finds that it was unreasonable for the Regional Director to conclude that Local 79's activity could constitute a violation of § 8(b)(4)(ii)(B).

### B.    Just and Proper

Even assuming that the Regional Director had reasonable cause to believe that Local 79 is violating the NLRA through its actions outside the Mannix Stores, the issuance of a preliminary injunction would not be just and proper.

The Second Circuit has made clear that injunctive relief is not "just and proper" where the Regional Director asks a court to "make the initial ruling as to the propriety of a novel and unprecedented application of the statute, and thereafter the Board will apply its expertise to the issues presented." Realty Assocs., 668 F.2d at 681. Such a request "inverts the traditional relationship between administrative agency and court" and is not a "just and proper" remedy, "at least in the absence of the most compelling circumstances." Id.; see also Nat'l Mar. Union of Am., AFL-CIO, 457 F.2d at 494 ("[A]ny expansion of the perimeters governing the statute's application is, first, the province of the Board and is not in the first instance a proper matter for the district court to resolve.").

Here, the Regional Director not only asks the court to adopt a new construction of the NLRA, it urges the court to depart from existing NLRB decisions in doing so. The NLRB has consistently held that expressive conduct, such as a stationary banner, the distribution of leaflets, and the use of an inflated rat to "shame" a secondary employer does not violate § 8(b)(4)(ii)(B). See Brandon II, 356 NLRB 1290 (2011) (distribution of leaflets and use of a rat balloon outside

secondary employer does not violate § 8(b)(4)(ii)(B) and to find otherwise would raise First Amendment concerns); Local Union No. 1827, 357 NLRB 415, 418 (2011) (permitting banner displays and explaining that "an employer's fear that a banner's message will lead its customers to take action does not render the banner display coercive"); Eliason, 355 NLRB 797 (2010) (holding that nonconfrontational display of stationary banners announcing a "labor dispute" and seeking to elicit "shame on" a secondary employer at issue here is not comparable to the types of conduct found to "threaten, coerce, or restrain" a neutral employer under § 8(b)(4)(ii)(B) and that such decision is "strongly supported, if not compelled, by [the NLRB's] obligation to seek to avoid . . . a serious constitutional question"). Indeed, Petitioner's counsel acknowledged at oral argument that the Regional Director is, with this petition, "making an argument that [Brandon II]," which counsel described as "the applicable law that binds the NLRB," "should be overturned." (Block Tr. at 15:8-10.) Counsel explained that the Regional Director "intend[s] to target that decision at the board." (Id. at 15:10-11.)

The NLRB has not ruled on whether the display of inflatables by Local 79 would violate § 8(b)(4)(i)(B), but in light of the relevant decisions in the subsection (ii) context, and "unless and until the Act is authoritatively construed in such fashion," the court does not believe that a section 10(l) injunction to prohibit the use of inflatables outside a secondary site is a "just and proper" remedy. See Realty Assocs., 668 F.2d at 681; see also Nat'l Mar. Union of Am., AFL-CIO, 457 F.2d at 494 ("[A]ny expansion of the perimeters governing the statute's application is, first, the province of the Board and is not in the first instance a proper matter for the district court to resolve.") Further, as stated above, the court does not believe that Local 79's protests were coercive. The court thus finds that it would not be "just and proper" to issue an injunction on the novel and expansive interpretation of the statute urged by the Regional Director.

31

Moreover, general equitable principles, which continue to apply, see Realty Assocs., 668 F.2d at 680, dictate against the issuance of a preliminary injunction. First, the Regional Director has delayed in seeking an injunction and provides no compelling argument as to why an injunction must issue in advance of the hearing scheduled for July 24, 2019. The rat has been used since April 29, 2019, the inflated cockroach has been used since May 15, 2019, and there was only one rally—also on May 15, 2019. Moreover, Mannix and the Mannix-owned companies have filed their own suit against Local 79 for damages allegedly suffered as a result of the ongoing demonstrations. The Regional Director has put forth no reason to believe that, without an injunction, Mannix will suffer irreparable harm. Finally, as the NLRB recognized in Eliason, "[g]overnmental regulation of nonviolent speech—such as the display of stationary banners—implicates the core protections of the First Amendment." 355 NLRB at 797. Concerns that the public may, in Mannix's view, misapprehend the degree of influence that Mannix has over the construction companies building his new supermarket, and thus unfairly pressure him to weigh in on Local 79's dispute with Kimco Realty and GTL Construction, simply do not outweigh the First Amendment implications of restricting a union's ability to publicize labor conflicts—nor do they justify adopting a "novel and unprecedented application of the statute." See Realty Assocs., 668 F.2d at 680.

## IV.   CONCLUSION

For the foregoing reasons, Petitioner's motion for a preliminary injunction is DENIED.

SO ORDERED.

/s Nicholas G. Garaufis
NICHOLAS G. GARAUFIS
United States District Judge

Dated: Brooklyn, New York
July  i  , 2019

32